391 F.3d 77
 SECURITY INSURANCE COMPANY OF HARTFORD a/s/o JT International Holdings, B.V., Plaintiff-Appellee,
v.
OLD DOMINION FREIGHT LINE, INC., Defendant-Cross-Claimant-Appellant,
v.
Concord Transportation, Inc., Defendant-Cross-Defendant.
 Docket No. 03-7981.
 United States Court of Appeals, Second Circuit.
 Submitted: May 24, 2004.
 Decided: December 2, 2004.
 
 Graham, Miller, Neandross, Mullin & Roonan, New York (Michael J. Slevin, New York, New York, of counsel), for Plaintiff-Appellee.
 Mauro Goldberg & Lilling, Great Neck, New York (Barbara D. Goldberg, Great Neck, New York, of counsel), for Defendant-Appellant.
 Before: VAN GRAAFEILAND*, KEARSE, and WESLEY, Circuit Judges.
 KEARSE, Circuit Judge.
 
 
 1
 Defendant Old Dominion Freight Lines, Inc. ("Old Dominion"), appeals from a judgment entered in the United States District Court for the Southern District of New York, Gerard E. Lynch, Judge, ordering it to pay $237,963.01 in damages and prejudgment interest to plaintiff Security Insurance Company of Hartford ("Security") as subrogee of the shipper of goods carried by Old Dominion that were stolen prior to delivery to their final destination. The district court, in an Opinion and Order dated August 20, 2003 ("District Court Opinion"), granted summary judgment in favor of plaintiff, ruling, inter alia, that, under the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 14706 ("Carmack Amendment"), Old Dominion was strictly liable for the loss of the goods and that plaintiff had presented sufficient evidence as to the quality and quantity of the goods delivered to Old Dominion for carriage. The court also rejected Old Dominion's contention that the present suit was not timely. On appeal, Old Dominion contends principally that the district court erred (1) in rejecting its untimeliness argument, (2) in ruling that Old Dominion was subject to strict liability, rather than to a negligence standard, and (3) granting summary judgment despite the presence of genuine issues of fact to be tried as to the contents and condition of the shipment when delivered to Old Dominion. We reject Old Dominion's first two contentions substantially for the reasons stated in the District Court Opinion at 9-14, 17-19. We find merit in the third contention for the reasons that follow.
 
 I. BACKGROUND
 
 2
 The facts of this case are largely undisputed. Old Dominion, a trucking company, and RJ Reynolds Tobacco Company ("RJR") were parties to a contract for the carriage of goods from RJR's Central Distribution Center in Winston-Salem, North Carolina ("RJR Distribution Center" or "Distribution Center"). Pursuant to the contract, on July 13, 1999, a shipment of Winston cigarettes and Camel Light cigarettes was loaded onto an Old Dominion truck at the Distribution Center and was to be transported to RJR's consignee, RJR-Macdonald, Inc. ("RJR-Macdonald"), in Montreal, Canada (the "July 13 shipment"). Through a subcontractor, Old Dominion transported the cigarettes to the Canadian border; there the shipment was stopped by Canadian customs officials, who ordered it detained until it received clearance. Pending customs approval of its release, the cargo was placed in a bonded warehouse. The cargo was stolen, by persons unknown, from the warehouse.
 
 
 3
 When the July 13 shipment failed to arrive at its final destination, RJR-Macdonald investigated and reported the theft to the Montreal police. The Canadian Mounties ultimately recovered some of the cargo; however, due to concerns about the quality of the recovered cigarettes, those cigarettes were destroyed.
 
 
 4
 RJR filed a claim with Old Dominion seeking compensation for the stolen cargo, and RJR-Macdonald filed an insurance claim with its insurer, Security. Security eventually paid RJR-Macdonald $195,938 for the loss and brought the present suit as subrogee of RJR's claim against Old Dominion, requesting $195,938 in damages, plus interest, costs, and attorneys' fees.
 
 A. Security's Motion for Summary Judgment
 
 5
 Security moved for summary judgment on its claim, submitting, to the extent pertinent to the merits, an affirmation by its attorney Michael J. Slevin and an affidavit by Walter F. Nowicki, who in July 1999 was a distribution manager at the RJR Distribution Center. Thereafter, Security also submitted the affidavit of Robert McMaster, who in 2002 was Director of Taxation and Insurance of the JTI-Macdonald Corp. (formerly called RJR-Macdonald). The Slevin affirmation, dated January 21, 2003 ("Slevin Aff."), briefly summarized the events and attached (1) the bill of lading for the July 13 shipment, (2) a chronology of the events surrounding that shipment, which Slevin described as having been prepared by (unidentified) RJR-Macdonald employees, (3) the contract between Old Dominion and RJR, and (4) correspondence between Old Dominion and RJR with respect to Old Dominion's rejection of RJR's claim.
 
 
 6
 The Nowicki affidavit described procedures generally used at the RJR Distribution Center to prepare shipments for transport:
 
 
 7
 4. The process used to retrieve and ship cigarettes is as follows:
 
 
 8
 When the carrier's truck arrives, an order is activated in our Central Distribution Management system and our automated retrieval system begins to send the product through a series of conveyor systems directly to the truck loading dock at which the carrier's truck is parked.
 
 
 9
 The movement of the product is monitored until it is confirmed arrived at the loading dock.
 
 
 10
 The product is then removed from the storage pallet and loaded on the floor of the truck.
 
 
 11
 Once the truck is loaded, the order is confirmed as being complete, "closed out" and shipped in the Central Distribution Management system. At this point the Bill of Lading is printed. An order cannot be "closed out" or confirmed "shipped" unless 100% of the required product has been delivered to the appropriate truck dock.
 
 
 12
 Once the order is confirmed shipped in the Central Distribution Management system, our inventory records are decremented [sic] by the amount loaded and shipped. This is confirmed through our inventory reconciliation process. Our inventories are reconciled to the book inventory daily as required by the Bureau of Alcohol Tobacco and Firearms.
 
 
 13
 When the Bill of Lading is printed, it is presented to the carrier for a signature and date and becomes our proof of shipment. The truck is then released to the carrier's driver.
 
 
 14
 (Affidavit of Walter Nowicki dated January 22, 2003 ("Nowicki Aff."), ¶ 4.)
 
 
 15
 As to the July 13 shipment in particular, Nowicki stated only that the shipment
 
 
 16
 was tendered to Old Dominion Freight Lines ("ODFL") for carriage from Winston-Salem, NC to the premises of RJR-Macdonald Inc. in Montreal, Quebec, Canada. Invoice # 84897903 was a "made to order" invoice. The two items shipped on this invoice were unique to this order and produced to a specific quantity. A true copy of the bill of lading for this shipment is attached hereto as Exhibit A. A representative of ODFL, presumably the driver of the truck, signed this document on July 13, 1999.
 
 
 17
 (Nowicki Aff. ¶ 5.) Although Nowicki stated that he was familiar with these procedures (see id. ¶ 3), he did not state that he had any personal knowledge as to the July 13 shipment.
 
 
 18
 The McMaster affidavit indicated that McMaster had no personal knowledge with respect to the July 13 shipment; a different RJR-Macdonald employee had been responsible for filing claims with the trucker and the insurer, and McMaster had subsequently assumed that employee's duties; McMaster stated that he had reviewed RJR-MacDonald's business records with respect to that shipment. (Affidavit of Robert McMaster dated December 22, 2002 ("McMaster Aff."), ¶¶ 3-4.) In addition to the bill of lading, the documents attached to the McMaster affidavit were the first page of the RJR invoice for the shipment (bearing the number 84897903), a Canadian customs invoice for taxes due, and a copy of RJR-MacDonald's check to customs. The RJR invoice indicated that the shipment contained 175 cases of "Winston Box" and 604 cases of "Camel Lt." (McMaster Aff. Exh. B.) According to the "PACKING DETAILS" section of that invoice, the gross per-case weight of the 175 cases was 17.20 pounds. The per-case weight of the 604 cases of Camel Lights was not shown; the bottom of the page bore a notion that the packing details were "CONTINUED ON NEXT PAGE" (id.), but no other pages were attached to the affidavit or otherwise made part of the district court record. The customs invoice showed the assessment of tax on a shipment containing "875mi WINSTON CIGARETTES" and "3020mi CAMEL LT. CIGARETTES." (McMaster Aff. Exh. C.) McMaster stated that RJR-Macdonald had filed a claim with Security for the loss of the July shipment and that Security had paid it $195,938 for that loss. (See McMaster Aff. ¶¶ 8, 11.)
 
 
 19
 The bill of lading, dated July 13, 1999, which was attached as Exhibit A to the Nowicki and McMaster affidavits and the Slevin affirmation (and which will henceforth be cited simply as "Exhibit A"), referred to invoice number 84897903 and listed the contents of the shipment as 604 cases of Camel Light cigarettes weighing 8,758 (the unit unspecified), and 175 cases of Winston Box cigarettes weighing 3,010 (unit unspecified). (See Exhibit A at 1.) The bill of lading also bore the notations "SHIPPER LOAD AND COUNT — CARRIER UNLOAD" (id. at 2) and "SEAL NO. 397999" (id. at 1; id. at 2).
 
 
 20
 In opposition to Security's summary judgment motion, Old Dominion proffered no affidavits but noted that Security had not submitted a statement of undisputed material facts, as required by Local Rule 56.1, and argued that the presence of several genuine issues of material fact was apparent from Security's own submissions. Old Dominion argued that one such issue was whether the cargo was delivered to Old Dominion in good condition. Old Dominion contended that the Nowicki affidavit suggested that the cargo had been loaded and sealed by RJR; and if the cargo were sealed prior to its receipt by Old Dominion, the bill of lading would not constitute prima facie evidence of the cargo's delivery in good condition.
 
 
 21
 In reply, Security argued that the Nowicki Affidavit sufficed to establish the condition and contents of the July 13 shipment because it showed that shipments are generally loaded into a carrier's truck in the presence of the carrier's employee and that, in the present case, Old Dominion's employee had initialed the bill of lading.
 
 B. The Decision of the District Court
 
 22
 The district court granted Security's motion for summary judgment. The court noted that in order to make a prima facie case of carrier liability under the Carmack Amendment, Security was required to show (1) "that the cargo was delivered to the carrier in good condition," (2) that it "arrived at the destination in damaged condition (or failed to arrive at all)," and (3) that Security suffered "damages." District Court Opinion at 19. The court stated that because Old Dominion conceded that the cargo was stolen from the Canadian warehouse and thus was never delivered to RJR-Macdonald, "the second element is met and plaintiff need only present evidence of the first and third elements of the prima facie case." Id.
 
 
 23
 As to the first element, the court noted that "[a] clean bill of lading is ordinarily prima facie evidence of delivery to the carrier in good condition," but that Old Dominion argued that Security had "failed to present evidence that the cargo was delivered in good condition to the carrier, because the cigarettes were in sealed packages and the carrier could not inspect the condition or quantity of cargo upon receipt." Id. at 20. The court acknowledged that
 
 
 24
 "[a] clean bill of lading does not ... constitute prima facie evidence of the condition of goods shipped in sealed packages where the carrier is prevented from `observing the damaged condition had it existed when the goods were loaded.'" Bally, Inc. v. M.V. Zim America, 22 F.3d 65, 69 (2d Cir.1994), quoting Caemint [Food, Inc. v. Brasileiro], 647 F.2d [347, 352 (2d Cir.1981)]. In the case of a sealed container, the shipper must present other evidence to show that the goods were delivered to the carrier in good order. See Bally, 22 F.3d at 69. The question here is whether plaintiff has presented evidence that the cigarettes were provided to Old Dominion in good condition in the amounts specified.
 
 
 25
 District Court Opinion at 20. The court answered that question in the affirmative, despite noting that "the Nowicki Affidavit is unclear about the nature of the cargo's packaging," and that Old Dominion "raised an issue of fact as to the packaging." Id. at 21. The court stated that
 
 
 26
 [e]ven assuming that the cargo was packaged in such a way that prevented inspection, there is sufficient other evidence of quantity and quality demonstrating delivery in good order to the carrier, and Old Dominion has failed to present any evidence creating a contested issue of material fact concerning the condition of cargo upon receipt.
 
 
 27
 As to quantity, the Consignee's [sic] invoice and the bill of lading state the number of boxes of cigarettes and their weight. Old Dominion does not dispute the weight of the shipment upon delivery or thereafter, or suggest that the cargo weighed less than what that amount of cigarettes should weigh. Since the carrier had a contractual duty to weigh the cargo (Contract ¶ 2(d)), its failure to contest that the weight of the cargo conformed to the purported number of boxes in the shipment confirms that the cargo contained the number of cigarettes indicated on the bill of lading.
 
 
 28
 As to quality, the Nowicki Affidavit provides detailed information on the retrieval system at the RJR facility. The multiple checks on inventory and the precise system described, in addition to the highly regulated nature of the cargo, provide ample basis for a factfinder to infer that the cargo was received in good condition. Once again, Old Dominion presents no evidence from which a factfinder could draw any other conclusion. In any event, the issue of quality is something of a red herring. This is not a case in which goods were delivered to the consignee in poor condition, and the question is whether they were originally shipped that way or the damage occurred during carriage. Here, the goods were never delivered, and there is no dispute that they were stolen during carriage. Under these circumstances, the issue of quality could at most bear on damages, and not on the carrier's liability.
 
 
 29
 District Court Opinion at 21-22 (emphasis added).
 
 
 30
 Judgment was eventually entered awarding Security a total of $237,963.01, comprising $195,938 in damages and $42,025.01 in prejudgment interest. For the reasons that follow, we disagree with the district court's conclusion that Security established its prima facie case as a matter of law, and we thus vacate and remand for further proceedings.
 
 II. DISCUSSION
 
 31
 Summary judgment may be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see, e.g., St. Pierre v. Dyer, 208 F.3d 394, 404 (2d Cir.2000). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir.1996), cert. denied, 517 U.S. 1190, 116 S.Ct. 1678, 134 L.Ed.2d 780 (1996); Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir.1994); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (summary judgment is proper only when "there can be but one reasonable conclusion as to the verdict"). The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment, see, e.g., Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), and in assessing the record to determine whether there is a genuine issue as to a material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought, see, e.g., Liberty Lobby, Inc., 477 U.S. at 255, 106 S.Ct. 2505; Stern v. Trustees of Columbia University, 131 F.3d 305, 312 (2d Cir.1997).
 
 
 32
 A summary judgment motion may be made with or without supporting affidavits, see Fed.R.Civ.P. 56(a); however, to the extent that affidavits are relied on, they "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein," Fed.R.Civ.P. 56(e) (emphases added). If the summary judgment motion "is not made and supported as provided in Rule 56, the Rule does not impose on the party opposing summary judgment an obligation to come forward with affidavits or other admissible evidence of his own." St. Pierre v. Dyer, 208 F.3d at 404. Indeed, "`[w]here the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented."' Adickes, 398 U.S. at 160, 90 S.Ct. 1598 (quoting Fed.R.Civ.P. 56 Advisory Committee Note (1963) (emphasis in Adickes)); see also Giannullo v. City of New York, 322 F.3d 139, 140-41 (2d Cir.2003) ("where the movant fail[s] to fulfill its initial burden of providing admissible evidence of the material facts entitling it to summary judgment, summary judgment must be denied, even if no opposing evidentiary matter is presented, for the non-movant is not required to rebut an insufficient showing") (internal quotation marks omitted).
 
 
 33
 In reviewing the grant of a motion for summary judgment, we review the record de novo, drawing all factual inferences and resolving all ambiguities in favor of the nonmoving party. See, e.g., Harris v. Provident Life & Accident Insurance Co., 310 F.3d 73, 78 (2d Cir.2002); Gummo v. Village of Depew, 75 F.3d at 107.
 
 
 34
 As discussed by the district court, a shipper's burden of proving that the goods were delivered to the carrier in good condition may be satisfied by the proffer of a clean bill of lading for the shipment, provided that the cargo was packaged in a way that permitted its inspection by the carrier. See generally Madow Co. v. S.S. Liberty Exporter, 569 F.2d 1183, 1185 (2d Cir.1978). However, where the contents of a shipment are not visible or open for inspection, as may be the case when cargo is transferred to the carrier in a sealed container, a clean bill of lading is not sufficient to establish delivery of the goods in good condition. Cf. Bally, Inc. v. M.V. Zim America, 22 F.3d 65, 69 (2d Cir.1994) (clean bill of lading is prima facie evidence of "delivery of the goods to the carrier in good condition" under the Carriage of Goods by Sea Act ("COGSA") for unsealed, but not for sealed, shipments); Caemint Food, Inc. v. Brasileiro, 647 F.2d 347, 352 (2d Cir.1981) (same); Project Hope v. M/V IBN SINA, 250 F.3d 67, 73 (2d Cir.2001) (for purposes such as these, "[t]he prima facie cases for both COGSA and the Carmack Amendment are identical"). Instead, when a carrier is prevented from independently inspecting cargo, the plaintiff must present additional evidence, either direct or circumstantial, in order to establish the initial contents and condition of the cargo. See, e.g., A.I.G. Uruguay Compania de Seguros, S.A. v. AAA Cooper Transportation, 334 F.3d 997, 1004 (11th Cir.2003); National Transportation, Inc. v. Inn Foods, Inc., 827 F.2d 351, 354 (8th Cir.1987).
 
 
 35
 In the present case, Security sought to carry its burden of showing that there was no genuine issue of fact to be tried as to the contents and quality of the stolen cargo principally by proffering the "quite detailed" bill of lading (Security brief on appeal at 30) and the Nowicki affidavit. However, the bill of lading itself suggests that the cargo was sealed, as it twice bears the notation "SEAL NO. 897999" (Exhibit A at 1; id. at 2). And, as the district court noted, "the Nowicki affidavit is unclear about the nature of the cargo's packaging." District Court Opinion at 21.
 
 
 36
 Security suggests that it nonetheless established the condition and contents of the July 13 shipment because the Nowicki affidavit showed that shipments are generally loaded into a carrier's truck and that "[t]he bill of lading is also initialed by the ODFL driver indicating that the Old Dominion driver should have had an opportunity to inspect the goods as they were loaded" (Security brief on appeal at 30 (emphases added)). Our difficulties with this argument begin with the fact that Nowicki, who professed his familiarity with RJR's "procedures" (Nowicki affidavit ¶ 3), made no such claim of personal familiarity with respect to this particular shipment. Further, assuming that the initials that appear on page 1 of the bill of lading are those of an Old Dominion employee, there is nothing on that document to show that the initials signified that the signer had been able to examine the contents of the shipment. Indeed, page 2 of the bill of lading bears the notation "SHIPPER LOAD AND COUNT — CARRIER UNLOAD" (Exhibit A at 2); there is no notation of a carrier count to support Security's factual contention that the initials "indicat[e]" (Security brief on appeal at 30) that the carrier had an opportunity to inspect the goods as they were being loaded. The present record simply does not reflect whether the seal was placed on the cargo before or after the Old Dominion driver had an opportunity to inspect the goods. Indeed, even Security's brief does not contend that there is evidence that the Old Dominion driver actually had such an opportunity, but only that he "should have had" (id.) such an opportunity. It may be reasonable for a trier of fact to conclude that the cargo was not sealed until after the Old Dominion driver had an opportunity to inspect it, or that it was not sealed in such a way as to prevent inspection; but in order to reach such a conclusion on the present record, factual inferences would need to be drawn in favor of Security. On Security's motion for summary judgment against Old Dominion, however, factual inferences must instead be drawn in favor of Old Dominion, and it is impermissible for the court to reach such a conclusion as a matter of law.
 
 
 37
 Accordingly, insofar as concerns the handling of the July 13 shipment in particular, the bill of lading itself, with its notations of "SHIPPER ... COUNT" and "SEAL[ED]," permits the inference that the carrier did not have an opportunity to verify the quantity and quality of the goods. And the Nowicki affidavit, to the extent that it suggests contrary inferences, failed to comply with three essential requirements of Rule 56(e) — that it be made on personal knowledge, provide admissible information, and show Nowicki's competence to provide that information.
 
 
 38
 The district court concluded that Security had presented sufficient evidence of the quantity of cigarettes loaded in the July 13 shipment because RJR's "invoice and the bill of lading state the number of boxes of cigarettes and their weight." District Court Opinion at 21. These documents, however, though perhaps they would be persuasive to a factfinder, were inconclusive. Only the first page of the RJR invoice was attached to the McMaster affidavit, and that page did not state the per-case weight of one portion of the shipment but rather bore the words "CONTINUED ON NEXT PAGE" (McMaster Aff. Exh. B). Although the district court stated that Old Dominion did not dispute the weight of the shipment or suggest that the cargo weighed less than what "that amount of cigarettes" should weigh, District Court Opinion at 21, the bill of lading's notation that the shipment was "SEAL[ED]" raised a question of fact as to whether the carrier was able to verify what "that amount of cigarettes" was.
 
 
 39
 Further, although the Nowicki affidavit described the RJR inventory system in order to support the bill of lading's representations as to quantity, the description was entirely general, and Nowicki did not describe or attach any records for the July 13 shipment. He stated generally that the "inventory records are decremented [sic] by the amount loaded and shipped," and that "[t]his is confirmed through our inventory reconciliation process," in which the "inventories are reconciled to the book inventory daily." (Nowicki Aff. ¶ 4.) But no inventory records with respect to the July 13 shipment were submitted to the district court; and the Nowicki affidavit did not even state conclusorily that the described RJR records showed a decrease in inventory that matched the quantities shown on the July 13 bill of lading.
 
 
 40
 As to whether the cigarettes contained in the July 13 shipment were of good quality, the district court concluded that Security had presented sufficient evidence because
 
 
 41
 the Nowicki Affidavit provides detailed information on the retrieval system at the RJR facility. The multiple checks on inventory and the precise system described, in addition to the highly regulated nature of the cargo, provide ample basis for a factfinder to infer that the cargo was received in good condition.
 
 
 42
 District Court Opinion at 21-22. The Nowicki affidavit's description of RJR's inventory system, however, dealt with quantification, not with quality. (See, e.g., Nowicki Aff. ¶ 4 ("inventory records" reveal "the amount loaded and shipped") (emphasis added)). We see nothing in the Nowicki affidavit to show "a factfinder," District Court Opinion at 22, that the cigarettes in the July 13 shipment were of good quality, much less to establish such quality as a matter of law.
 
 
 43
 Finally, as to the quality of the cigarettes at the time of shipment, Security argues that
 
 
 44
 [i]n a non-delivery situation plaintiff is not in a position to show the condition of the remaining goods after the loss because, due to the defendant's failure to deliver, there are no remaining goods.
 
 
 45
 (Security brief on appeal at 29 (emphasis added).) This might well be true in an ordinary case involving theft of a shipment before delivery to the consignee. In this case, however, part of the stolen shipment was in fact recovered (see, e.g., Security brief on appeal at 28 ("after the shipment was stolen[,] the Canadian Mounties recovered some of the goods")); hence there in fact were some "remaining goods" that could have been examined for quality.
 
 
 46
 Security also argues that "because after the shipment was stolen the Canadian Mounties recovered some of the goods," "it is clear that the goods were packed in the container in good order and condition." (Security brief on appeal at 28.) This conclusion cannot logically follow from its premise unless there were, inter alia, some examination of the recovered goods that revealed their good condition. Security has provided no evidence of such an examination. Indeed, its summary judgment motion revealed that the recovered cigarettes were promptly destroyed because the consignee had concerns about their quality. (See McMaster Aff. ¶ 9.) That fact enhances, rather than answers, the question as to their quality at the time of shipment. A factfinder might well be persuaded that the destruction resulted from concern over the conditions in which the cigarettes had been maintained in the interval between their theft and their recovery (see id.); but we see nothing that requires acceptance of that explanation for the quality-related concern as a matter of law.
 
 
 47
 In sum, our review of the record leads us to the conclusion that there were genuine issues of material fact to be tried as to the quantity and quality of the goods in the July 13 shipment and that Security did not establish its entitlement to judgment as a matter of law.
 
 CONCLUSION
 
 48
 We have considered all of Security's arguments in support of summary judgment on the merits of its claim and have found them to be without merit. The judgment of the district court granting summary judgment in favor of Security is vacated, and the matter is remanded for further proceedings not inconsistent with this opinion.
 
 
 
 Notes:
 
 
 *
 Judge Van Graafeiland, who was a member of the panel, died on November 20, 2004. Prior to his death, he participated in the consideration and decision of this case