Jacqueline **LENNON**, Plaintiff,

v.

**NYC; NYC Health and Hospitals Corp.; Kings County Hospital; George Proctor; Peter Griffith; and Jean Leon, Defendants.**

**No. 03 Civ. 2427(RWS).**

United States District Court,
S.D. New York.

Oct. 6, 2005.

---

**60.** *Id.* at 355.

**61.** *Id.*

**62.** *See* GRC Reply Mem. at 2–3.

Andrew J. Schatkin, Jericho, NY, for Plaintiff.

Michael A. Cardozo, Corporation Counsel of the City of New York, New York, NY, by Donald Sullivan, Alecia Walters, for Defendants, of counsel.

## OPINION

SWEET, District Judge.

Defendants New York City ("the City"), New York City Health and Hospitals Corporation ("HHC"), Kings County Hospital Center ("KCHC"), George Proctor ("Proctor"), Peter Griffith ("Griffith"), and Jean Leon ("Leon") (collectively, the "defendants"), have moved for summary judgment pursuant to Rule 56, Fed.R.Civ.P., to dismiss the complaint of plaintiff Jacqueline Lennon ("Lennon"). For the reasons set forth below, the motion is granted in part and denied in part.

*Prior Proceedings*

Lennon, a Senior Associate Director formerly employed by HHC, filed her complaint on April 8, 2003 alleging employ-

ment discrimination pursuant to Title VII,[1] the New York State Human Rights Law ("SHRL"),[2] the ADEA,[3] and ADA,[4] based on her race ("American Black"), national origin (African–American), age (56 in 2004) and purported disability (fibromyaligia), contending that her staff was involuntarily transferred, that her department was downsized, and that she was denied a promotion and terminated.

Discovery proceeded and the instant motion was heard and marked fully submitted on March 23, 2005.

### The Facts

The facts are set forth in the Local Rule 56.1 statements of the parties and are undisputed except as noted below.

Lennon graduated from Bronx Community College, Baruch College, and Fordham University (Master of Science). She began working at the HHC in 1982 and worked at Harlem Hospital, Woodhull Hospital, and Lincoln Hospital.

On August 11, 1998, Lennon applied for the position of Executive Assistant to the Executive Director at Woodhull Hospital with HHC, and on October 26, 1998, she was appointed to this position. She received Woodhull's new employee handbook, HHC's Equal Employment Opportunity Policy, and notice that as a Group II (managerial) employee she would not be covered by the collective bargaining agreement.

In January 1999, Lennon, who alleges she was then 51 years old, applied for the position of Senior Associate Director in Media Relations and Marketing at KCHC as a result of a posting. She was recruited

and hired for this position by Leon. At the time, Leon was 55, and she testified that her race and national origin was black Trinidadian. Lennon testified that "Jean Leon, the executive director at Kings County Hospital asked that I apply for the marketing position at Kings County Hospital."

Proctor, who interviewed Lennon, was 46 years old at the time of recruitment and is an African–American.

Lennon was formally promoted to the position of Senior Associate Director of Media Relations and Marketing at KCHC by HHC on or about February 8, 1999, received a 15% salary increase, and was again informed that as a managerial employee she would not be covered by the collective bargaining agreement.

Lennon's supervisor in February of 1999 was Proctor (African–American), who was Chief Operating Officer/Chief Financial Officer for the Brooklyn/Staten Island network, a network of HHC facilities in Brooklyn and Staten Island.

Lennon received an annual evaluation for the period from July 1, 1999 to June 30, 2000 from her supervisor Proctor and her performance was rated "satisfactory." This evaluation was reviewed by Leon. According to the evaluation, Lennon needed to improve her delegation of functions and activities to staff, to improve her coordination with other departments, and to increase broad marketing themes.

Lennon received an annual evaluation for the period from July 1, 2000 to June 30, 2001 from her supervisor Proctor. Her

---

**1.** "Title VII" refers to Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. §§ 2000e, *et. seq.*

**2.** Codified at New York Executive Law §§ 290, *et. seq.*

**3.** "ADEA" refers to the Age Discrimination in Employment Act, codified at 29 U.S.C. § 621 *et. seq.*

**4.** "ADA" refers to Americans with Disabilities Act, codified at 42 U.S.C. § 12101 *et. seq.*

performance was rated "satisfactory" and the evaluation was reviewed by Leon.

Lennon has testified that she has fibromyaligia, which she describes as a stress related illness that results in pain in her joints and muscles, and that she takes Tramadol, Ibuprofen, and Tripalmitin to control her fibromyaligia.

In 2001 she was given permission by Proctor to attend physical therapy two to three times a week in the mornings. Proctor believed Lennon had back pains and some form of carpal tunnel syndrome. Lennon requested, and was given, a special chair, back rest and other ergonomic furniture for her alleged illness.

Lennon testified that fibromyaligia did not prevent her from functioning at KCHC or at her present job at State University of New York Downstate Hospital as Director of Marketing.

In 2001 Lennon's department consisted of no more than five to six people which included Frisnert Benoit, James Hoban, Duane Chandler, and Deborah Souviner.

In 2001 Leon and Proctor testified that they decided to restructure the media relations and marketing department by increasing the community outreach and business development aspect of the department. According to Leon and Proctor, they believed that an Associate Executive Director position should be created to oversee the department.

In February 2001, the position of Associate Executive Director of Media, Marketing, Community Relations and Business Development at KCHC was posted. Lennon applied and was interviewed for the position. She testified that she was told not to apply by Proctor and that she was interviewed by Proctor and Ms. Brown, who was from the Caribbean.

Griffith, a black male of Trinidadian national origin, also applied for the position.

Lennon testified that Griffith "might be 40." Donald LaHuffman, an African–American in his 30's, also applied for the position and was interviewed.

Proctor testified that he believed that Griffith was the most qualified candidate because "[l]ooking at his resume, he did extensive community outreach in the D.A.'s office and the business development. He had formed various linkages with merchants, associations ... that was the strategic decision that we wanted."

On August 6, 2001, Griffith was appointed to the position of Associate Executive Director of Media, Marketing, Community Relations and Business Development at KCHC.

Griffith replaced Proctor as Lennon's supervisor on or about August 2001 and reported directly to Leon.

By memorandum dated September 19, 2001, Lennon, Deborah Souvenir, and Duane Chandler were informed by Griffith that he was conducting a departmental audit and to complete this audit he needed a detailed list of their current major tasks/functions and an updated resume.

By memorandum dated October 9, 2001, Duane Chandler and Lennon were informed by Griffith that they were required to submit reports for each event and/or meeting attended and an activity report for each month.

By memorandum dated October 18, 2001, Lennon was informed of "changes to committee assignments" by Griffith and also was informed that Griffith was "currently assessing existing staff duties as part of a department-wide audit and reorganization."

By memorandum dated January 7, 2002, Lennon's department was reminded that the department's name had been changed from Media Relations and Marketing to

"Office of Communications and Business Development" to reflect the new emphasis on the community outreach and business development aspect of the department. On February 13, 2002, Griffith received a six month evaluation from Leon describing the reorganization of the department.

By letter dated February 15, 2002, Lennon was notified by Harold S. Goldstein, Associate Executive Director, that she was terminated from her position as Senior Associate Director at KCHC as a result of the reorganization and management restructuring to the department. According to this letter, once the restructuring was completed, the level of her position was no longer needed.

Lennon testified that Griffith lacked experience and education. She also testified that because of her national origin, she was excluded by Leon from meetings where marketing had a major role, that Leon would ask other people to chair hospital events, and that African Americans were not favored where Trinidadians were. She also testified that when Griffith was hired, Duane Chandler, Leon's stepson, was placed in Lennon's office, and that she had no supervision over him. According to Lennon, Chandler was a young man in his twenties of Caribbean descent who did marketing. She testified that he did much of her work, often duplicating her efforts, and that he invaded her computer.

Lennon testified that Proctor discriminated against her by making her do too much work. According to her, she worked for six months with no help and that she sent in a staffing plan that was never reviewed. She also testified that Leon hired much younger people, including Griffith and James Hobbins, and that Griffith bombarded her with memos, belittled her by this method, and interfered with Lennon's relationships with vendors. Lennon also alleges that Juliet Barnes, an African American, was forced out by Leon.

Griffith took Ms. Souvenir, Lennon's secretary, and removed her from Lennon's office and placed her in his. According to Lennon, Griffith favored younger men, such as Duane Chandler, James Hobbins, and Benoit, who was from Haiti (the Caribbean).

As a result of transfers, Lennon testified that she had more work and no help or assistance and even had to take minutes for meetings. According to Lennon, she discussed fibromyaligia with KCHC and was told they were hiring someone else.

In accordance with her rights as a managerial employee under Corporate Operating Procedure 20–39, Lennon appealed her termination; the appeal was reviewed by Leon, and by letter dated March 12, 2002, Leon informed Lennon that the decision to terminate her services would not be reversed. According to Leon, she found the "reorganization of the Media Relations Department to be efficient and managerially sound." Leon Letter 3/12/02.

During her employment at HHC, Lennon attended yearly in-service training where she was informed of the EEO/Affirmative Action policy which included information about the ADA and she testified that she did not file any discrimination complaints with the KCHC EEO office regarding her claims of discrimination.

On June 18, 2002, Lennon filed a charge of discrimination with the NYSDHR, which was simultaneously filed with the Equal Employment Opportunity Commission. According to the complaint, Lennon claimed discrimination based on her age, race, national origin and disability. By letter dated January 27, 2003, Lennon was issued a right to sue letter as a result of a request from her attorney.

On or about March 11, 2003, the NYSDHR issued a no probable cause determination after an investigation of Lennon's claims, finding that "half of the twenty Associate Directors and Senior Associate Directors employed by respondent at [plaintiff's] work location from January of 2000 to June of 2002 were of the same race as complainant, and a majority were of the same sex and national origin as complainant." Determination and Order after Investigation, 3/07/03, p. 1.

### The Summary Judgment Standard

Pursuant to Rule 56, summary judgment may be granted only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *SCS Communications, Inc. v. Herrick Co., Inc.*, 360 F.3d 329, 338 (2d Cir.2004). The court will not try issues of fact on a motion for summary judgment, but rather, will determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Summary judgment is appropriate where the moving party has shown that "little or no evidence may be found in support of the nonmoving party's case. When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223–24 (2d Cir.1994) (internal citations omitted). If, however, " 'as to the issue on which summary judgment is sought, there is any evidence in the record from which a rea-

sonable inference could be drawn in favor of the opposing party, summary judgment is improper.' " *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir.2004) (quoting *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir.1996)).

The moving party has the burden of showing that there are no material facts in dispute, and the court must resolve all ambiguities and draw all reasonable inferences in favor of the party opposing the motion. *Bickhardt v. Ratner*, 871 F.Supp. 613 (S.D.N.Y.1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Thus, "summary judgment may be granted if, upon reviewing the evidence in the light most favorable to the non-movant, the court determines that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir. 1993).

A material fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 57 (2d Cir.1997).

■ "The salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation." *Nicastro v. Runyon*, 60 F.Supp.2d 181, 183 (S.D.N.Y. 1999) (citing *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir.1988)). Greater caution must be exercised, however, in granting summary judgment in employment discrimination cases where the employer's intent is genuinely in issue. *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d

Cir.1999). This is so because "employers are rarely so cooperative as to include a notation in the personnel file that the [action complained of] is for a reason expressly forbidden by law." *Bickerstaff v. Vassar College,* 196 F.3d 435, 448 (internal quotation marks and citation omitted; brackets in the original). But even where an employer's intent is at issue, "a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir. 1997); *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985).

### Pre–August 2001 Claims Are Time–Barred

■ A Title VII plaintiff must file a complaint with the EEOC within 180 days of when she knew or had reason to know of the alleged unlawful employment action or, if she has already filed a charge with the relevant state or local equal employment agency, within 300 days of that action. *See* 42 U.S.C. § 2000e–5(e); *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 712–13 (2d Cir.1996); *Cornwell v. Robinson,* 23 F.3d 694, 703–04 (2d Cir. 1994) (citations omitted). If a plaintiff fails to meet the applicable statute of limitations her claim will not be actionable in federal court. *See Cornwell,* 23 F.3d at 703–04. The Supreme Court, in its most recent decision on the matter, has reiterated that "strict adherence" to the statute of limitations is mandated. *See National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 108, 122 S.Ct. 2061, 153 L.Ed.2d 106 (quoting *Mohasco Corp. v. Silver,* 447 U.S. 807, 826, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980)).

■ There is a continuing-violation exception to the statute of limitations which "extends the limitations period for all claims of discriminatory acts committed under an ongoing policy of discrimination even if those acts, standing alone, would have been barred by the state of limitations." *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 765 (2d Cir.1998) (internal quotation marks and citation omitted). A continuing violation may be found "where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Cornwell,* 23 F.3d at 704. However, "discrete incidents of discrimination that are not related to discriminatory policies or mechanisms may not amount to a continuing violation." *Id.* Moreover, it has been frequently noted that the continuing violation doctrine is disfavored in this Circuit and will be applied only upon a showing of compelling circumstances. *See, e.g., Katz v. Beth Israel Med. Ctr.,* 2001 WL 11064, at \*8, 2001 U.S. Dist. LEXIS 29, No. 95 Civ. 7183 (S.D.N.Y. Jan.4, 2001); *Findlay v. Reynolds Metals Co., Inc.,* 82 F.Supp.2d 27, 37 (S.D.N.Y.2000) (collecting cases).

Lennon filed her charge of discrimination with the NYSDHR/Equal Employment Opportunity Commission ("EEOC") on June 18, 2002. Title VII, ADEA, or ADA claims regarding incidents which occurred prior to August 22, 2001, *i.e.,* 300 days prior to her filing are time-barred. 42 U.S.C. § 2000e–5(e)(1) (Title VII); 29 U.S.C. § 626(d); *see* 42 U.S.C. § 12117(a); *Tewksbury v. Ottaway Newspapers, Inc.,* 192 F.3d 322, 328–29 (2d Cir.1999); 42 U.S.C. § 2000e–5(e)(1) (2000) (300 day limitations period applies to ADA claims); *Hawana v. City of New York,* 230 F.Supp.2d 518, 525 (S.D.N.Y.2002) (300 day limitations period applies to Title VII, ADEA, and ADA claims).

Lennon's claim that the defendants committed continuous acts of harassment and

a continuous pattern of race and disability discrimination, and that therefore the continuing violation exception should be applied, also must fail.

First, certain of the acts Lennon has cited are discrete acts. Lennon's opposition memorandum alleges that she was wrongfully denied a promotion. In *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 108, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), the Supreme Court explicitly stated that a failure to promote is a discrete act for limitations purposes. *Morgan* at 108, 122 S.Ct. 2061.

■ The remaining acts charge that Lennon was subjected to a hostile environment. However, this claim was not presented to the administrative agency, and therefore this Court lacks subject matter jurisdiction over it. *Brown v. Coach Stores*, 2000 WL 1239113 at *2, 2000 U.S. Dist. LEXIS 12604, *7–8 (S.D.N.Y.2000). *See also Kent v. Avco Corp.*, 815 F.Supp. 67 (D.Conn.1992) (dismissing parts of plaintiff's complaint he did not mention denied promotions, low wages or inadequate secretarial services in his EEOC complaint, although all his claims were based on the theory of age discrimination).

■ In addition, the discrete acts that Lennon contends show that she was discriminated against are not supported by any evidence of any specific policy or mechanism for discrimination in place. *See Ofudu v. Barr Lab., Inc.*, 98 F.Supp.2d 510, 515 (S.D.N.Y.2000). Nor has she produced any evidence of specific and related instances that HHC allegedly permitted to continue unremedied for an overly long period. *Id.* Lennon has not cited to any other similarly situated African–Americans who have been discriminated against except for a single conclusory statement that lacks any other support in the record beyond her allegation. *See* P. Opp. at pp. 14 (alleging only that a particular person,

whom plaintiff contends was African–American, "suffered at the hands" of a single individual defendant). These conclusory allegations of a continuing violation will not suffice to fulfill the pleading requirement of a continuing violation. *See Alveari v. American Int'l Group, Inc.*, 590 F.Supp. 228, 231 (S.D.N.Y.1984). She also concedes that she did not bring to her employer's attention the discriminatory treatment she was allegedly subjected to.

Therefore, the claims relating to conduct occurring before August 22, 2001, including Lennon's denial of promotion claim that accrued on June 6, 2001, are time-barred.

### The Claims Against The City, The Individual Defendants, And HHC Are Dismissed

Lennon has alleged claims against KCHC, HHC, the City, and certain individuals. With respect to her claims against the City, it is undisputed that the City did not employ Lennon. Furthermore, New York courts have expressly held that the City is a separate legal entity from HHC. *See Haynes v. Giuliani*, 238 A.D.2d 257, 657 N.Y.S.2d 18 (1st Dept. 1997) (HHC is an entity separate and distinct from the City of New York with "complete autonomy respecting its personnel."); *Binyard v. City of New York*, 151 A.D.2d 712, 543 N.Y.S.2d 145 (2d Dept. 1989) (HHC is a separate and distinct entity from the City of New York); *Williams v. City*, 97 A.D.2d 372, 468 N.Y.S.2d 1 (1st Dept.1983) (City of New York is not proper party in an action against HHC, which is a separate and distinct entity). *See also Brennan v. City*, 59 N.Y.2d 791, 464 N.Y.S.2d 731, 451 N.E.2d 478 (1983) (HHC is a public benefit corporation independent of the City of New York and is not an agency of the City of New York).

The only allegations of mistreatment that Lennon makes in the complaint are directed to HHC, KCHC, and three of its employees. In the absence of any allegations directed to the City, it is dismissed.

■ The claims against the individually named defendants are also dismissed. It is well-settled that individuals may not be held personally liable under Title VII. *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir.1995), *abrogated on other grounds, Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). In addition, the individually named defendants cannot be held liable under the ADEA. *Parker v. Metropolitan Transportation Authority*, 97 F.Supp.2d 437, 452 (S.D.N.Y.2000). Although the Second Circuit has yet to expressly rule on the issue, district courts have held that individually named defendants cannot be personally liable under the ADA. *See, e.g., Cerrato v. Durham*, 941 F.Supp. 388, 395 (S.D.N.Y.1996); *Gentile v. Town of Huntington*, 288 F.Supp.2d 316, 322 (E.D.N.Y. 2003); *Altman v. New York City Health and Hospitals Corp.*, 903 F.Supp. 503, 508 (S.D.N.Y.1995), *aff'd*, 100 F.3d 1054 (2d Cir.1996); *Yaba v. Cadwalader, Wickersham & Taft*, 931 F.Supp. 271, 274 (S.D.N.Y.1996) (all rejecting individual liability under the ADA). Accordingly, Lennon's Title VII, ADEA, and ADA claims against Proctor, Leon, and Griffith are dismissed.

■ Lennon's claims against HHC are also dismissed. HHC is not liable for any claims made by Lennon because HHC did not have knowledge of the alleged actions or inactions by Proctor, Griffith, or Leon, nor was it reasonable for HHC to have had such knowledge. *Burlington Industries v. Ellerth*, 524 U.S. 742, 754, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) and *Faragher v. Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Further, Lennon unreasonably failed to take advantage of preventative or corrective opportunities provided by HHC to its employees or to otherwise avoid harm. Here, Lennon was aware of HHC's EEO policy and even attended workshops about EEO/Affirmative Action and Americans with Disabilities Act, but she failed to file an EEO complaint. Lennon has not challenged the lack of knowledge of HHC. *See Hawana v. City of New York*, 230 F.Supp.2d 518, 525 (S.D.N.Y.2002); *Broad v. DKP Corp.*, 1998 WL 516113 at *3, 1998 U.S. Dist. LEXIS 12942, *6 (S.D.N.Y. Aug. 19, 1998) (granting defendant's motion to dismiss where plaintiff failed to oppose defendant's motion), *aff'd without published opinion*, 182 F.3d 898 (2d Cir.1999), *reported in full at* 1999 WL 447632, 1999 U.S.App. LEXIS 13328 (2d Cir. June 16, 1999).

### The SHRL Claims Are Barred By The Election Of Remedies

New York Executive Law § 297(9) provides, in relevant part:

> Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction for damages ... unless such person had filed a complaint hereunder or with any local commission on human rights, ... provided that, where the division has dismissed such complaint on the grounds of administrative convenience, on the grounds of untimeliness, or on the grounds that the election of remedies is annulled, such person shall maintain all rights to bring suit as if no complaint had been filed with the division.

N.Y. Exec. Law § 297(9). Put succinctly, subsection 297(9) provides that "a person claiming to be aggrieved by an unlawful discriminatory practice may seek relief either from a court of appropriate jurisdiction or from the [New York State Division

of Human Rights] or any local commission on human rights, but not both." *Clements v. St. Vincent's Hosp. & Med. Ctr.*, 919 F.Supp. 161, 164 (S.D.N.Y.1996); *see also Moodie v. Fed. Reserve Bank*, 58 F.3d 879, 882–83 (2d Cir.1995) ("Generally, the remedies of administrative review through the Human Rights Division or judicial review are mutually exclusive.") (internal citation omitted and emphasis in original); *accord Thomas v. New York City Health & Hosps. Corp.*, No. 02 Civ. 5159(RJH), 2004 WL 1962074, at *1 n. 1, 2004 U.S. Dist. LEXIS 17694 (S.D.N.Y. Sept. 2, 2004); *Benjamin v. N.Y. City Dep't of Health*, No. 99 Civ. 12345(LTS)(AJP), 2003 WL 22883622, at *6, 2003 U.S. Dist. LEXIS 21973 (S.D.N.Y. Dec. 8, 2003); *Bullock v. Presbyterian Hosp.*, No. 95 Civ. 3928(JSM), 1996 WL 328740, at *2, 1996 U.S. Dist. LEXIS 8240 (S.D.N.Y. June 13, 1996). This express limitation on the election of remedies applies equally to NYHRL claims brought in state court and to those brought as pendant claims in federal court. *See, e.g., Thomas*, 2004 WL 1962074, at *1 n. 1, 2004 U.S. Dist. LEXIS 17694 (citing *Collins v. Mfrs. Hanover Trust Co.*, 542 F.Supp. 663, 672–73 (S.D.N.Y.1982)); *Hunnewell v. Mfrs. Hanover Trust Co.*, 628 F.Supp. 759, 761 (S.D.N.Y.1986).

According to Lennon, even if the election of remedies doctrine is applicable to her Section 296 claim, "that rule is inapplicable to this primarily federal discrimination case." In support of this assertion, Lennon cited to *EEOC v. Rotary Corp., Long v. ATT Information Systems,* and *Universal Packing Corp. v. New York State Division of Human Rights.* In *EEOC v. Rotary Corp.*, 164 F.Supp.2d 306 (2001), the plaintiff filed a complaint with the EEOC and never filed a charge of discrimination with the SDHR. *Id.* at 309. In *Long v. AT&T Information Systems Inc.*, 733 F.Supp. 188 (1990), although

plaintiff did not initially file a complaint with the SDHR, the Court refused to exercise jurisdiction over plaintiff's state law claims because of plaintiff's overt act in bringing the case before the SDHR a second time. *Id.* at 199–200. Consequently, the Court declined to exercise jurisdiction over these claims. *Id.* at 200. In *Universal Packaging Corp. v. New York State Division of Human Rights*, 270 A.D.2d 586, 704 N.Y.S.2d 332 (3d Dept. 2000), the complaint was dismissed because of administrative convenience. *Id.* at 586–87, 704 N.Y.S.2d 332.

██ Here, Lennon's SHRL claims are barred by the election of remedies doctrine because she filed an administrative complaint on June 18, 2002, with the SDHR against HHC, alleging unlawful employment action on the basis of age, disability, national origin, race, color, and sex, and the SDHR issued a no probable cause determination after an investigation.

Section 297(9) divests this Court of such jurisdiction, a point which Lennon's opposition chose to ignore. Consequently, the Section 296 claims are dismissed.

### There Is A Triable Inference Of Discrimination By KCHC

Last, we turn to Lennon's claims of discrimination by KCHC.

██ Title VII makes it unlawful "for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, [or] national origin...." 42 U.S.C. § 2000e–2(a)(1). The "ultimate issue" in any employment discrimination case is "whether the plaintiff has met her burden of proving that the adverse employment decision was motivated at least in part by an 'impermissible

reason.' " *Stratton v. Department for the Aging,* 132 F.3d 869, 878 (2d Cir.1997).

 Two methods exist by which a plaintiff can attempt to prove intentional discrimination. First, the plaintiff may present direct evidence of employment discrimination based on an illegitimate criterion. When an employee produces direct evidence that an illegitimate criterion such as race "played a motivating part in [the] employment decision," *Price Waterhouse v. Hopkins,* 490 U.S. 228, 258, 109 S.Ct. 1775, 1795, 104 L.Ed.2d 268 (1989), the burden-shifting standards of *Price Waterhouse* apply. As such, "the defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the [illegitimate criterion] into account." *Id.* at 258, 109 S.Ct. at 1795.

Lennon has presented no direct evidence of defendants' intentional discriminatory statements or actions. Therefore, it is necessary to turn to the second means of proving discrimination.

 When plaintiffs rely on indirect or circumstantial evidence of discrimination, their claims are analyzed under the three-part test announced in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, the plaintiff must establish her *prima facie* case by showing that: (1) she was a member of a protected group; (2) she was satisfactorily performing the duties required of the position; (3) she was discharged; and (4) the discharge occurred under circumstances giving rise to an inference of discrimination. *See, e.g., McLee v. Chrysler Corp.,* 109 F.3d 130, 134 (2d Cir.1997). Second, if the plaintiff successfully establishes a *prima facie* case of discrimination, the defendant may rebut that showing by articulating a legitimate, non-discriminatory reason for the employment

action. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1115 (2d Cir.1988) (the defendant "is required to articulate—but not prove—a legitimate, non-discriminatory reason for the discharge"). Finally, if the defendant articulates a non-discriminatory reason, the plaintiff must come forward with evidence that the defendant's articulated non-discriminatory reason is a mere pretext for actual discrimination. *Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 (2d Cir. 2000) ("The plaintiff must 'produce not simply some evidence but sufficient evidence to support a rational finding that the legitimate non-discriminatory reasons proffered by the [defendant] were false and that more likely than not [discrimination] was the real reason for the' " employment action (quotations and citations omitted; brackets in original)).

 Pursuant to this framework, Lennon has established a *prima facie* case of discrimination based upon national origin and age.

As to the first element of the *prima facie* case, there is no dispute that Lennon is a member of a protected class.

As to the second element, Lennon received annual evaluations, completed by her supervisors, stating that her performance was satisfactory.

 Lennon has also established the third prong, that she suffered an adverse employment action. Typically, adverse employment actions are economic injuries such as a termination, suspension, failure to promote, or diminution in pay. *See Sanders v. N.Y. City Human Res. Admin.,* 361 F.3d 749, 755 (2d Cir.2004). It is Lennon's position that her termination resulted from her age and national origin,

that Griffith, a Trinidadian in his forties, was selected to replace her by Leon, also a Trinidadian. The stepson of Leon, also Trinidadian, was hired and according to Lennon, was not supervised by her, and without authority took over her responsibilities and invaded her computer. According to Lennon, the reorganization was simply a device by which her job and her job alone was eliminated. As such, Lennon's claim that she was terminated based on her national origin and age satisfies the third prong of *McDonnell Douglas*.

Finally, as to the fourth prong of the *prima facie* case, with respect to her termination by KCHC, Lennon has established that the termination occurred under circumstances giving rise to an inference of discrimination. It appears to be Lennon's position that Griffith was selected because of his age and national origin, that she was denied that position because of hers, and that the selection compelled the redundancy of her position and her consequent termination. This inference is supported by the hiring and treatment of Leon's stepson.

According to the defendants, Lennon testified that she had a positive working relationship with Leon until she became jealous of her alleged accomplishments, and to the extent that the alleged conflict between herself and Leon was personal, Lennon's own claim that Leon was motivated by discriminatory animus is weakened. *See Rodriguez v. Human Resources Administrative for Children's Services*, 1998 WL 879690 at *4, 1998 U.S. Dist. LEXIS 19567, *11 (S.D.N.Y. Dec. 16, 1998) (where plaintiff characterizes dispute with supervisor as a personality conflict, plaintiff's statement "supports the defendant's position that there is no evidence of discrimination").

The defendants also note that although Lennon has contended that Griffith treated her harshly, she has not identified any record evidence suggesting that his alleged treatment was based on discriminatory animus or identified a single statement that was made to her that evidenced any form of discrimination against her. *See Dean v. Westchester County District Attorney's Office*, 119 F.Supp.2d 424, 430 (S.D.N.Y.2000) (granting defendant's motion to dismiss because plaintiff's conclusory allegations that persons outside her protected class were treated better than her insufficient to support hostile work environment claim).

 Defendant states that Lennon was terminated because of a reorganization of the department. This is a legitimate non-discriminatory reason. As noted above, however, plaintiff counters that the reorganization of the department was pretextual. In support of this contention, Lennon points out that, after he was hired and well before the reorganization began, Griffith took all of Lennon's staff and responsibilities.

Given the evidence before it, this Court cannot conclude that no rational trier of fact could find in plaintiff's favor on her claims of national origin and age discrimination by KCHC. Granting the inference in favor of the opponent of the summary judgment motion *Security Ins. Co. of Hartford*, 391 F.3d at 83 (2d Cir.2004) (quoting *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir.1996)), it is inferred that a triable issue has been created on the allegation that KCHC discriminated against Lennon and that a reasonable jury could find that she was terminated because of her age and national origin.

It is so ordered.