Jose M. DIAZ, Plaintiff,

v.

TMC SERVICES, Defendant.

No. 04 CIV. 10310(RWS).

United States District Court,
S.D. New York.

Aug. 31, 2006.

Jose M. Diaz, Bronx, NY, Plaintiff Pro Se.

Kevin F. Kostyn, Esq., New York, NY, for Defendant.

## OPINION

SWEET, District Judge.

TMC Services, Inc. ("TMC") has moved pursuant to Rule 56, Fed.R.Civ.P., for summary judgment dismissing the complaint of plaintiff *pro se* Jose Diaz ("Diaz"), alleging discrimination on the basis of race and national origin in violation of Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. §§ 2000e, *et seq.* For the reasons set forth below, the TMC motion is granted, and the complaint is dismissed.

*Prior Proceedings*

Diaz, a Latino of Puerto Rican descent, filed a claim of employment discrimination with the United States Equal Opportunity Employment Commission ("EEOC") on or about July 22, 2004. On September 29, 2004, the EEOC issued a Dismissal and Notice of Rights.

Diaz filed his complaint on December 30, 2004, alleging that TMC discriminated against him by refusing certain requested shift changes, by suspending him, and, ultimately, by terminating his employment. Diaz seeks damages in the amount of $160,200 for back wages and pain and suffering.

TMC filed its answer on May 11, 2005, and discovery proceeded. The instant motion was filed on March 9, 2006. Diaz filed an un-notarized affirmation in opposition on March, 27, 2006, and the motion was marked fully submitted on April 12, 2006.

*The Facts*

The facts are taken from TMC's statement of material facts pursuant to Local Rule 56.1(a), as well as from Diaz's un-notarized affirmation in opposition. Because Diaz's affirmation does not comply with the requirements of Local Rule 56.1(b),[1] the facts set forth in TMC's Rule 56.1 statement are deemed admitted where supported by the record. *See* Local Rule 56.1(c); *Giannullo v. City of New York,* 322 F.3d 139, 140 (2d Cir.2003); *Evans v. City of New York,* 308 F.Supp.2d 316, 319 n. 2 (S.D.N.Y.2004). The facts are not disputed except as noted below.

TMC is a New Jersey company that contracts to provide operations and maintenance services in the tri-state area. TMC has a total of 1189 full-time employees, 530 of whom are Latino. Diaz is Latino. TMC also employs 283 temporary and part-time employees, 149 of whom are Latino. Of 109 employees who serve in management positions, 34 are Latino.

On October 31, 2003, TMC was awarded a contract with the Port Authority of New York and New Jersey (the "Port Authority") to perform operations and maintenance services at the World Trade Center site (the "Site"). TMC is responsible for maintaining, repairing, and reconfiguring various pumping stations at the Site so that ground water can be pumped on a

---

1. The Rule requires that:

The papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried. Local Civil Rule 56.1(b).

daily basis. TMC also provides janitorial services and HVAC for the mobile offices and trailers throughout the Site, oversees the maintenance of electrical power and lighting, and maintains exhaust fans that pull air from underground areas to reduce humidity.

Although TMC is required by its contract with the Port Authority to provide coverage at the Site twenty-four hours a day, seven days a week, the principal hours of operation at the Site are from 7:00 a.m. to 3:30 p.m.

TMC employs approximately ten people during the regular working hours to provide the requisite services. From 3:30 p.m. to 7:00 a.m., only a single employee— an assistant superintendent—is required to be on Site. Because heavy equipment is not in operation at that time, the assistant superintendent's duties between 3:30 p.m. and 7:00 a.m. are limited to watching the Site, and he requires no supervision.

In November 2003, Diaz was hired as the Operations and Maintenance Supervisor by Art Kalpin ("Kalpin"), Vice President of Operations for TMC. Kalpin is responsible for overseeing all of TMC's work sites, including the World Trade Center Site. Diaz had been recommended for the job by the Port Authority Maintenance Supervisor Dennis Malopolski ("Malopolski") who had worked with Diaz at the World Trade Center some years earlier.

Diaz was hired as an at-will, hourly employee, his position was non-union, and he did not have a written employment contract.

Diaz worked at TMC from November 2003 to June 2004, and during that period there were approximately twelve persons, including Diaz, who were employed by TMC at the Site. The employees and their titles are set forth as follows:

Bob Vitiello, Project Manager

John Natale, Assistant Superintendent

Dennis McCaan, Assistant Superintendent

Dave Davis, Assistant Superintendent

Konstantine Vaysbeyn, Assistant Superintendent

Milton Tejera, Custodial Supervisor

Jose Diaz, Operations and Maintenance Supervisor

George Iacono, Maintenance Mechanic

Brian O'Leary, Mechanic's Helper

Cesar Romero, Foreman

Romira Serena, Cleaner

Leonardo Lazolion, Cleaner

Of the twelve listed TMC employees, Diaz and four other employees, including the Custodial Supervisor, were Latino.

TMC's contract with the Port Authority required that the Operations and Maintenance Supervisor be on Site during the principal operating hours of 7:00 a.m. to 3:30 p.m., Monday through Friday. Diaz was responsible for supervising the Maintenance Mechanic and the Mechanic's Helper, as well as "two electricians, three janitors, [and] one janitorial supervisor" (Diaz Tr. at 54), all of whom also were on Site during the regular working hours of 7:00 a.m. to 3:30 p.m.

Diaz reported directly to Robert Vitiello ("Vitiello"), the Project Manager, who in turn reported to Kalpin. Vitiello was a salaried employee, and his assigned shift was from 7:00 a.m. to 3:30 p.m. As Project Manager, Vitiello was the designated on-site liaison with Malopolski of the Port Authority. However, TMC's contract with the Port Authority stated that all TMC supervisory staff shall "be authorized by [TMC] to receive and put into effect promptly all orders, directions and instructions from [Port Authority personnel]." (Kalpin Aff. Ex. B.)

Vitiello started work with TMC in December 2003 and had over twenty years' experience in the building maintenance and services industry. Throughout his career, Vitiello attended many management training classes and seminars dealing with avoiding discrimination in the workplace. Prior to Diaz's complaint, Vitiello had never been accused of discrimination. Diaz himself testified that Vitiello never insulted Diaz's race or ethnic background. (Diaz Tr. at 106.)

Diaz testified at deposition that although Vitiello could "come off as somebody low key, soft spoken, ... he had a very short fuse" (Diaz Tr. at 96), and at times would yell and scream and use profanities (*id.* at 96–121). Diaz testified that he felt "very threatened" by Vitiello. (*Id.* at 105.) He noted that Vitiello also had angry confrontations with several other TMC employees, including Milton Tejara, Steve Kalpin, George Iacono ("Iacono"), and John Natale (*id.* at 103–05), and that other TMC employees approached him and said, "Bob has a hot head, what is wrong with Bob, he is too moody." (*Id.* at 114.)

On December 30, 2003, approximately two months after starting his employment with TMC, Diaz asked Vitiello if he could change his shift from 7:00 a.m. to 3:30 p.m. to 7:30 a.m. to 4:00 p.m. Diaz requested the shift change because he was working a night job during the hours of midnight to 7:00 a.m. and needed an extra half-hour to get to work. After consulting with Kalpin, Vitiello granted Diaz's request.

Vitiello and Kalpin determined that Diaz's request was a modest one that would not result in any loss of coverage at the Site or otherwise negatively impact TMC's operations. They concluded that the shift change actually would benefit TMC because Diaz would be leaving work at 4:00 p.m. instead of 3:30 p.m. and would therefore have an opportunity to make no-

tations of any problems that arose during the day shift that might require attention, and would be on site to properly transition to the night shift. According to Diaz, the Assistant Superintendent who was the only TMC employee on Site for the hours after 3:30 p.m. arrived at noon and was relieved at midnight by another Assistant Superintendent, and thus his requested shift change would have had no effect on the transition to the night shift.

Two other TMC employees, Dennis McCaan ("McCaan") and Brian O'Leary ("O'Leary"), also had their shifts changed. In 2004, McCaan, an Assistant Superintendent, asked to have his hours reduced from full-time to part-time. Prior to McCaan's request for a reduction in hours, he and the three other Assistant Superintendents were being paid as full-time, forty-hour a week employees to satisfy the TMC–Port Authority contract requirement that an Assistant Superintendent always be on Site. Vitiello concluded, and Kalpin concurred, that by granting McCaan's request for part-time status, TMC could provide the coverage the contract required, save money, and have at its disposal a part-time, per diem employee who could be used to "plug holes" in the schedule as necessary without incurring unnecessary overtime. The change in McCaan's hours benefitted TMC's operations and was supported by both Vitiello and Kalpin. Diaz testified that Assistant Superintendents "ha[d] unique scheduling" and "obviously" were in a different situation compared to Diaz. (Diaz Tr. at 62–65.)

O'Leary, a Mechanic's Helper, was subordinate to Diaz and not similarly situated in terms of job or rank. O'Leary never requested a shift change, but instead was directed by Vitiello to reduce his shift by one-half hour, from 7:00 a.m. to 3:30 pm. to

7:30 a.m. to 3:30 p.m.[2] Prior to O'Leary's shift change, Vitiello staggered the shifts of two other employees to provide the coverage required by the TMC–Port Authority contract and additionally had to pay O'Leary a half-hour of overtime. Vitiello concluded, after conferring with Kalpin, that the change in O'Leary's shift would minimize overtime while still providing the coverage required under TMC's contract with the Port Authority, and therefore would be a direct benefit to TMC's operations.

Diaz has knowledged that the shift changes granted to the McCaan and O'Leary in no way impacted the operations of the Site. (Diaz Tr. at 256.)

In May 2004, Diaz once again asked Vitiello if he could change his shift, this time to start his shift one and a half hours earlier and work from 6:00 a.m. to 2:00 p.m. instead of 7:30 a.m. to 4:00 p.m. At his deposition, Diaz refused to give the reason for requesting another shift change. In his opposition, Diaz noted that at the time he made the request he was involved in a matrimonial dispute, and wanted a shift change so that he could attend afternoon court hearings. According to Diaz, Vitiello told him that he wanted to think about it and thereafter did not respond to the request for a number of weeks.

Vitiello and Kalpin both concluded that Diaz's suggested shift change would not benefit TMC's operations at the site. As an initial matter, the only employee required to be on Site from 6:00 a.m. to 7:00 a.m. was an Assistant Superintendent who finished his night shift at 7:00 a.m. As Diaz was not responsible for supervising the Assistant Superintendents, there would be no one at the Site for Diaz to supervise for the first hour of his requested shift. Vi-

tiello and Kalpin also were concerned by the fact that if Diaz's request were granted, Diaz would not be on Site to supervise the day shift employees from 2:00 p.m. to 3:30 p.m., and therefore would not be able to "close the book" on the business day, get the overnight staff ready, and to make any necessary preparations for the next day's activities. Diaz stated at deposition that it was necessary to supervise these employees and that no one else on site would have been capable of performing his job. (Diaz Tr. at 55.) Finally, Vitiello and Kalpin concluded that it would have a negative effect on employee morale if Diaz left work earlier than the employees he was charged with supervising.

Diaz was agitated and frustrated that Vitiello did not grant his second request for a shift change within what Diaz felt was a reasonable time. He also was experiencing "increased friction" with Vitiello as a result of Vitiello's "rude" and "threatening" behavior. (Diaz Tr. at 171.) Accordingly, on or about May 17, 2004, Diaz "felt it was necessary to take some time off" (Diaz Tr. at 181), and requested a one-week vacation from May 24 through May 28, returning on June 1, 2004. Vitiello accommodated the request, even though Diaz gave only one week's notice, while TMC's policy requires one month's notice (Kalpin Aff. Ex. E, ¶ 300.2). Diaz has acknowledged that the grant of vacation time was an example of favorable treatment by Vitiello. (Diaz Tr. at 183.)

Diaz returned to work on June 1, 2004. As of that date Vitiello had not approved Diaz's request to change his shift to 6:00 a.m. to 2:00 p.m. Diaz understood that, absent express permission from Vitiello, Diaz was expected to punch in at his as-

---

**2.** This was essentially the same shift change that Vitiello previously had approved as an     accommodation to Diaz.

signed 7:30 a.m. start time. However, Diaz punched in at 6:00 a.m. because, as Diaz testified, "I needed to work from 6 to 2 and I felt Bob [Vitiello] was taking much too long to honor this request." (Diaz Tr. at 185–86.)

Vitiello, who was present at the Site, asked Diaz why he was punching in at 6:00 a.m. instead of at the start of his assigned shift. Diaz insisted that he "needed" to work from 6:00 to 2:00 and that it was "unfair" for Vitiello not to honor his request. Vitiello instructed Diaz to punch out and to punch back in at 7:30 a.m., Diaz's assigned start time. Diaz refused to punch out and continued to protest for about five minutes.

Vitiello told Diaz he was suspended indefinitely and to leave the Site. Diaz refused, and told Vitiello that he did not have the authority to remove him from the Site and that he was going to remain on Site until Malopolski arrived.

Diaz remained on Site and waited for Malopolski to arrive for work at 7:00 a.m. Diaz met with Malopolski in his office and told him that Vitiello had dismissed him and that the dismissal was unwarranted. Diaz left the meeting with Malopolski and had additional words with Vitiello at which point Vitiello again instructed Diaz to leave the Site. Kalpin supported Vitiello's decision to order Diaz to leave the Site. Diaz eventually left the Site, but returned the next day without permission to pick up his personal items.

On the following day, June 3, 2004, Diaz again tried to gain access to the Site. Konstantine Vaysbeyn ("Vaysbeyn"), an Assistant Superintendent who was aware that Diaz had been ordered off the Site, previously had contacted security and instructed them to invalidate Diaz's Site pass. Accordingly, when Diaz arrived at the Site on June 3, he was denied access to the Site by the security guard. According to Diaz, only Port Authority officials had the authority to invalidate an on Site pass.

Later that day, Diaz submitted a written complaint to Philip Caprio, Jr., one of the principals of TMC, stating that Vitiello had wrongfully discharged him. According to the internal complaint, Diaz believed Vitiello discriminated against him because Diaz (1) was Latino and (2) had a good relationship with the Port Authority. The sole basis set forth in the internal complaint for Diaz's belief that Vitiello discriminated against him on the basis of race was that two Caucasian employees had been granted shift changes whereas Diaz's request had been denied.

Sometime thereafter, Diaz called Kalpin to discuss his status with TMC. During the conversation, which he recorded without Kalpin's knowledge, Diaz repeated his complaint that Vitiello was customizing other employees' hours and granting them privileges while at the same time refusing to approve Diaz's request for a change in his shift.

A few weeks later, at the behest of Malopolski, Diaz was asked to meet with Kalpin and Malopolski. Diaz understood that the possibility of him continuing in his job was still "on the table." (Diaz Tr. at 219–20.) Diaz refused to accept any conditions to his employment, including acknowledging that if he returned to work his shift would have to be 7:30 a.m. to 4:00 p.m. Unknown to Kalpin, Diaz had already found other employment immediately after he had been ordered off the Site by Vitiello in early June. Diaz's new job paid him as much, if not more, than his job at TMC.

During the course of the meeting, which Diaz recorded without Kalpin or Malopolski's knowledge, Diaz continued to criticize Vitiello and TMC's operations at the Site and complained that Vitiello was out of control, indecisive, a problem, and unpro-

fessional. (Kostyn Aff. Ex. C. at 5, 9, 12.) Diaz also accused Iacono, a Maintenance Mechanic, of insubordination (*id.* at 11); contended that Vaysbeyn made false statements about Diaz and that he should be suspended (*id.* at 13); offered his opinion that the Assistant Project Managers were "grossly overpriced watchmen" who did not do a good job (*id.* at 16); accused Kalpin of "fabricating things" since TMC started working at the Site in November 2003 (*id.* at 17); and accused TMC of running a "dictatorship" (*id.* at 28).

Diaz also demanded that Kalpin pay him $31,000 to buy him out of his contract (*id.* at 3) and continued to insist that he was the victim of discrimination because he is Latino, based entirely on the fact that two other employees who were Caucasian were granted shift changes. (*Id.* at 17–27.)

Kalpin eventually ended the meeting and made the final decision to terminate Diaz's employment with TMC. Diaz has acknowledged that his relationship with Kalpin was very good (Diaz Tr. at 103, 224), and testified that Kalpin admired Diaz for his diligence and work ethic, always treated Diaz respectfully (*id.* at 224–25), and never discriminated against him (*id.* at 12, 229).

Diaz's experience at TMC did not have any negative effect on his ability to perform the job he obtained immediately after leaving TMC. (Diaz Tr. at 249.) Diaz has not sought any medical treatment or counseling in connection with any purported emotional distress arising from his discharge. (Diaz Tr. at 251.)

Diaz testified, consistent with his internal complaint and his EEOC action, that the second reason he was terminated and/or suspended was because people were jealous of his close relationship with Malopolski. (Diaz Tr. at 129–36.) Diaz testified about numerous occasions when he reported problems directly to Malopolski instead of first addressing his concerns with his direct superiors Vitiello or Kalpin. (Diaz Tr. at 119–20, 122–23, 167–68.) Diaz's habit of going directly to Malopolski created tensions between Diaz and Vitiello who, as Project Manager, was designated by TMC as the chief liaison with the Port Authority.

As of March 22, 2004, Diaz had already used all of his sick time (five days) for the entire calendar year of 2004 and had arrived late for his shift eleven times in less than three months. Diaz was counseled with respect to his repeated tardiness. (Diaz Tr. at 232–34.) Diaz also had been counseled by Kalpin about his repeated failures to follow the prescribed chain of command and his habit of reporting directly to Malopolski instead of his superiors at TMC.

The main TMC trailer on the Site where employees punch in every day has prominently posted Company Work and Conduct Regulations that all TMC employees are expected to follow. The first rule states that TMC employees "shall not be permitted to [r]efuse to follow instructions or accept work assignments or to be otherwise insubordinate or disrespectful to or undermine the authority of any supervisor." (Kalpin Aff. Ex. D, at 1.)

TMC also made available to its employees an employee handbook that states that all employees "may be terminated at any time with or without cause." (Kalpin Aff. Ex. E, ¶ 700.1.) The handbook further states:

> The following are examples of infractions of rules of conduct that may result in any disciplinary or other action deemed appropriate in TMC's sole discretion, including, without limitation, immediate termination of employment …

- Insubordination or other disrespectful conduct towards supervisors and/or co-workers.
- Refusing to follow instructions or accept work assignments.
- Unsatisfactory performance or conduct.

(*Id.*)

*The Standard For Summary Judgment*

Pursuant to Rule 56, Fed.R.Civ.P., summary judgment may be granted only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *SCS Communications, Inc. v. Herrick Co.,* 360 F.3d 329, 338 (2d Cir.2004). The court will not try issues of fact on a motion for summary judgment, but rather, will determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Summary judgment is appropriate where the moving party has shown that "little or no evidence may be found in support of the nonmoving party's case. When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1223–24 (2d Cir.1994) (internal citations omitted). If, however, "as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 83 (2d Cir.2004) (quoting *Gummo v. Village of Depew,* 75 F.3d 98, 107 (2d Cir.1996)).

The moving party has the burden of showing that there are no material facts in dispute, and the court must resolve all ambiguities and draw all reasonable inferences in favor of the party opposing the motion. *Bickhardt v. Ratner,* 871 F.Supp. 613 (S.D.N.Y.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Thus, "summary judgment may be granted if, upon reviewing the evidence in the light most favorable to the non-movant, the court determines that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir. 1993).

A material fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 57 (2d Cir.1997).

*Diaz Has Failed To Establish A Prima Facie Case Of Discrimination*

Title VII makes it unlawful "for an employer ... to fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race ... or national origin ...." 42 U.S.C. § 2000e–2(a)(1).

In Title VII employment discrimination cases, the plaintiff has the initial burden to establish a *prima facie* case by pointing to evidence in the record demonstrating that (1) he is a member of a protected group,

(2) he was satisfactorily performing the duties required of his position, (3) he suffered an adverse employment action, and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 311–12 (2d Cir.1997); *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir.1995).

If the plaintiff meets the burden of establishing a *prima facie* case, then the burden of production (although not the burden of proof) shifts to the employer to show that any adverse employment actions were taken for legitimate, non-discriminatory reasons. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Once Defendants produce such evidence, "[t]he presumption [raised by the *prima facie* case] ... simply drops out of the picture." *Id.* at 511, 113 S.Ct. 2742. At that point, "the governing standard is simply whether the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination occurred." *James v. New York Racing Ass'n*, 233 F.3d 149, 156 (2d Cir.2000).

■ In order to meet the fourth requirement of a *prima facie* case of discrimination under *McDonnell Douglas*, Diaz must proffer admissible evidence "show[ing] circumstances that would be sufficient for a rational finder of fact to infer a discriminatory motive." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 38 (2d Cir.1994). In the absence of evidence that Vitiello or anyone else at TMC acted against Diaz for discriminatory reasons, Diaz has not stated a *prima facie* case. *See Rivera v. City of New York*, 392 F.Supp.2d 644 (S.D.N.Y.2005).

■ On a motion for summary judgment, the nonmoving party "must present concrete particulars and cannot succeed with purely conclusory allegations." *Cadle Co. v. Newhouse*, No. 01 Civ. 1777, 2002 WL 1888716, at *4 (S.D.N.Y. Aug. 16, 2002) (internal quotation marks omitted); *see also Cameron v. Cmty. Aid for Retarded Children, Inc.*, 335 F.3d 60, 63 (2d Cir.2003) (finding "[p]urely conclusory allegations of discrimination" insufficient to defeat summary judgment motion). "Personal speculation is insufficient as a matter of law to raise an inference of discrimination." *Boise v. New York University*, No. 03 Civ. 5862(RWS), 2005 WL 2899853, at *4 (S.D.N.Y. Nov.3, 2005).

Diaz testified that Vitiello never made derogatory remarks about Diaz's race or ethnicity, and has not produced any evidence that Vitiello discriminated against any other Latino employees. Diaz testified that Vitiello mistreated a number of TMC employees, but his testimony makes clear that such alleged mistreatment took place without regard to race or national origin.

Diaz testified at his deposition that Kalpin—who hired Diaz, concurred with Vitiello's personnel decisions, and ultimately made the final decision that Diaz should not be employed at the Site—always treated him respectfully. He has failed to produce any evidence whatsoever that could lead a rational finder of fact to conclude that Kalpin's decision to terminate his employment was motivated by discriminatory animus.

■ Diaz has testified that his problems were solely with Vitiello and that the tension between them was in the nature of a personality conflict. As the Second Circuit has noted, Title VII provides no remedy for mistreatment that is not based on race or another impermissible ground. *See Fisher v. Vassar Coll.*, 114 F.3d 1332, 1337

(2d Cir.1997) (noting that an employer may take adverse action against an employee for any "reason that is non-discriminatory but unbecoming or small-minded, such as back-scratching, log-rolling ... spite or personal hostility"), *abrogated on other grounds, Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133, 147–48, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Whether or not Diaz is correct that he was fired at least in part because of his close relationship with Malopolski and other Port Authority staff, this motivation does not support an inference of discrimination, nor is it in itself an impermissible reason for his termination under Title VII.

Diaz has sought to support an inference of discrimination from the fact that two Caucasian employees were granted shift changes. However, even if TMC's refusal to grant Diaz a shift change could be viewed as an adverse employment action, the fact that TMC modified the shifts of two Caucasian employees not in equivalent positions or with comparable duties is insufficient to establish an inference of racial discrimination, particularly given that the shift change granted to one of the employees was virtually identical to the first shift change Vitiello approved for Diaz.

■ Rather than produce evidence to support an inference of discrimination, Diaz has challenged the wisdom and utility of TMC's decisions. The court's role is "to prevent unlawful hiring practices, not to act as a superpersonnel department that second guesses employers' business judgments." *Byrnie v. Bd. of Educ.,* 243 F.3d 93, 103 (2d Cir.2001); *see also Rojas v. Florida,* 285 F.3d 1339, 1342 (11th Cir. 2002) (federal courts "are not in the business of adjudging whether employment decisions are prudent or fair. Instead our sole concern is whether discriminatory animus motivates a challenged employment decision.")

## TMC Had Legitimate, Non–Discriminatory Reasons For Its Employment Decisions

■ Even if Diaz had met his *prima facie* burden, TMC has produced evidence to meet its burden of demonstrating non-discriminatory business reasons for its refusal to grant Diaz's request for a shift change, its decision to suspend Diaz, and its ultimate decision to terminate his employment. Once the defendant produces such evidence, "the presumption raised by the *prima facie* case is rebutted, and drops from the case." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. at 510–11, 113 S.Ct. 2742.

TMC's contract with the Port Authority required TMC staff to be on Site during the regular hours that the Site was in operation, namely, 7:00 a.m. to 3:30 p.m. TMC had accommodated Diaz's first request to change his shift to 7:30 a.m. to 4:00 p.m. because it was a modest change and there would still be adequate coverage on the Site from 7:00 a.m. to 7:30 a.m.

In contrast, Diaz's request to start his shift earlier and begin his supervisory functions at 6:00 a.m. and leave at 2:00 p.m. were inconsistent with Site operations, and Diaz's assigned duties as a supervisor. The employees Diaz was charged with supervising did not begin work until 7:00 a.m. Diaz's requested shift change would have resulted in his leaving the Site ninety minutes earlier than the employees he was charged with supervising. These are legitimate reasons to deny the request for a shift change.

The events leading up to Vitiello's decision to suspend Diaz also demonstrate that TMC had legitimate, nondiscriminatory reasons for its action. Diaz did not receive permission from anyone to change his shift to 6:00 a.m. to 2:00 p.m. and on June 1, 2004, unilaterally decided to punch in at

6:00 a.m. When challenged, Diaz did not punch out as instructed and argued with Vitiello about his requested shift change, accusing him of preferential treatment of other employees.

When Vitiello finally suspended Diaz and directed him to leave the Site, Diaz refused, and challenged Vitiello's authority to remove him from the Site. Rather than leave as instructed, or contact Kalpin, Diaz remained on Site for at least another hour and met with Malopolski of the Port Authority to complain about Vitiello's decision. Diaz further admits that, notwithstanding Vitiello's order that he stay away from the Site indefinitely, he entered the Site without permission the next day and attempted to enter the Site again two days later.

On June 18, 2004, in the presence of TMC's client, the Port Authority, Diaz continued to complain about Vitiello, challenging his competence and rationality, and labeling him a "problem." He also listed the perceived shortcomings and faults of other employees on the Site, calling them "overpaid watchmen" and "lazy," and generally expressing disdain for his co-workers. When Kalpin questioned the propriety of raising such matters in front of TMC's client, Diaz explained that it "was a good thing that the dirt comes out now." (Kostyn Affirm. Ex. C.) Diaz also stated that he was still unwilling to adhere to his assigned shift time of 7:30 a.m. to 4:00 p.m., and continued to complain about purportedly preferential treatment afforded to other employees.

Finally, Diaz has failed to present evidence that TMC's reasons for its employment decisions were mere pretext for actual discrimination. As the Second Circuit noted in *Weinstock*, "The plaintiff must produce not simply some evidence but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false and that more likely than not [discrimination] was the real reason" for the termination. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir.2000), *cert. denied*, 540 U.S. 811, 124 S.Ct. 53, 157 L.Ed.2d 24 (2003) (internal quotation marks and citations omitted) (alterations in original). "It is not enough to disbelieve the employer, the fact finder must believe the plaintiff's explanation of intentional discrimination." *St. Mary's Honor Ctr.*, 509 U.S. at 519, 113 S.Ct. 2742.

*Conclusion*

For the reasons set forth above, the motion of TMC for summary judgment dismissing Diaz's complaint in its entirety is granted.

Submit judgment on notice.