In re WORLD TRADE CENTER LOWER MANHATTAN DISASTER SITE LITIGATION.

Jerzy Muszkatel, Plaintiff,

v.

90 Church Street Limited Partnership, et al., Defendants.

Case Nos. 21–mc–102, 06–cv–05285.

United States District Court, S.D. New York.

Signed Oct. 9, 2014.

Gregory J. Cannata, Robert Allen Grochow, Gregory J. Cannta & Associates, New York, NY, for Plaintiff.

Lee Ann Stevenson, Brett J. Broadwater, Theresa Jeane Lee, Zuckerman, Spaeder LLP, Richard Eric Leff, McGivney &

Kluger, William D. Joyce, Suzanne M. Halbardier, Barry, McTiernan & Moore, Jennifer L. Ferraro John P. Cookson, McElroy, Deutsch, Mulvaney & Carpenter, LLP, Philip Goldstein, McGuire Woods LLP, Frank Joseph Keenan, Methfessel & Werbel, PC, Jason Andrew Harrington, Nicholas John Kauffman, Wilson Elser Moskowitz Edelman & Dicker LLP, Andrew William Amend, Office of the Attorney General of the State of New York, New York, NY, Robert Richard Brooks–Rigolosi, Segal McCambridge Singer & Mahoney, Ltd., Chicago, IL, Allyson A. Avila, Wilson Elser Moskowitz Edelman & Dicker LLP, Stamford, CT, for Defendants.

**ORDER AND OPINION DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT DISMISSING COMPLAINT**

ALVIN K. HELLERSTEIN, District Judge.

In this action, Plaintiff Jerzy Muszkatel, a licensed asbestos abatement worker, asserts claims for common law negligence and violations of sections 200 and 241(6) of the New York Labor Law. Muszkatel's claims are based upon injuries suffered after working in numerous buildings in the vicinity of the World Trade Center site in the weeks, months, and years following the 9/11 terrorist attacks. Muszkatel asserts his claims against various owners, managing agents, lessees, environmental consultants, and contractors (collectively, "Defendants") that owned, managed or worked in the buildings.

The Defendants have moved for summary judgment to dismiss the claims against them. The owners, managing agents, and lessees moving for summary judgment are: Verizon New York, Inc., Boston Properties, Inc., 90 Church Street, L.P., Battery Park City Authority, Merrill Lynch & Co., Inc., WFP Tower B Co., L.P., WFP Tower D Co., L.P., Sakele Brothers L.L.C., and various entities I will designate as "BNY Mellon"[1] (collectively, the "Owner Defendants"). The environmental consultants moving for summary judgment are: Ambient Group, Inc., Hillmann Environmental Group, LLC, Weston Solutions, Inc. (collectively, the "Environmental Consultant Defendants"), and Indoor Environmental Technologies, Inc. The only general contractor moving for summary judgment is Structure Tone, Inc. ("Structure Tone"). The only subcontractor moving for summary judgment is Blackmon–Mooring Steamatic Catastrophe, Inc. ("BMS"). For the following reasons, the Defendants' motions are granted in part and denied in part.

**I. Background[2]**

I previously provided, in detail, the facts relevant to these motions in *In re World Trade Center Lower Manhattan Disaster Site Litigation,* 44 F.Supp.3d 409, No. 09–cv–680, 2014 WL 4446153 (S.D.N.Y. Sept. 9, 2014). For this reason, familiarity with the facts is presumed and this opinion will describe only the facts relevant to my disposition of the issues presented by the motions before me.

**A. 2 World Financial Center**

2 World Financial Center is located directly west of the World Trade Center

---

1. The BNY Mellon entities include the Bank of New York Mellon Corp., Bank of New York, One Wall Street Holdings LLC, 4101 Austin Blvd. Corp., and the Bank of New York Trust Company, N.A.

2. The facts stated here are either undisputed or presented in the light most favorable to Muszkatel, as the nonmoving party. *See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 83 (2d Cir.2004).

site. On September 11, 2001, Brookfield Financial Properties L.P. ("Brookfield") owned WFP Tower D Co. L.P., which, in turn, owned 2 World Financial Center and leased the building to Merrill Lynch & Co., Inc. ("Merrill Lynch"). *See* Aff. Daniel M. Kindbergh Supp. Merrill Lynch Mot. Summ. J. ("Kindbergh Aff.") ¶ 3. Battery Park City Authority ("BPCA") was the ground lessor. *See* Decl. Philip Goldstein Supp. Merrill Lynch Mot. Summ. J. ("Goldstein Decl."), Exh. DD at 16:13–18. 2 World Financial Center sustained substantial damage to its eastern facade and a significant amount of dust and debris entered the building. *See id.*, Exh. R. The "Winter Garden," a glass-enclosed lobby connecting 2 World Financial Center and 3 World Financial Center, suffered severe structural damage including broken windows and demolished walls. *See* Decl. Gregory J. Cannata Supp. Pls.' Opp'n Defs.' Mots. Summ. J. ("Cannata Decl."), Exh. 139.

Merrill Lynch retained Weston Solutions, Inc. ("Weston") and GPS Environmental Consultants, Inc. ("GPS") to test and analyze the dust and debris inside 2 World Financial Center. *See* Goldstein Decl., Exh. R, Exh. Y at 118:13–119:15. Beginning September 26, 2001, Weston conducted comprehensive testing for numerous potential air contaminants, including asbestos, fibrous glass, heavy metals, and volatile organic compounds. *See id.*, Exh. N, Exh. Q. After both GPS's and Weston's air testing revealed the presence of asbestos, both allegedly advised Merrill Lynch to implement asbestos-specific procedures. *See id.*, Exh. R, Exh. W at 103:18–105:18. Weston, however, denies that it advised Merrill Lynch with respect to the asbestos abatement. *See* Decl. Nicholas Kauffman Supp. Weston Mot. Summ. J. ("Kauffman Decl."), Exh. O ¶¶ 5–7. There is no evidence that Weston tested the pH level of the dust. *See, e.g.,*

Cannata Decl., Exh. 123. While Weston denies directly supervising the abatement workers or developing a safety protocol for the general abatement work at 2 World Financial Center, *see id.*, Exh. O ¶¶ 5–7, it did create a remediation protocol and provided project monitoring for mold abatement conducted in the basement, *see* Kauffman Decl., Exh. O ¶ 8. Muszkatel also presents evidence that Weston oversaw "all phases" of the cleanup work at 2 World Financial Center. *See* Cannata Decl., Exh. 4 at 106:3–107:16.

Certain tenants at 2 World Financial Center retained Hillmann Environmental Group, LLC ("Hillmann") as their environmental consultant. *See* Decl. Salvatore J. Calabrese Supp. Hillmann Mot. Summ. J. ("Calabrese Decl."), Exh. C, ¶¶ 20–42. Hillmann did not have any agreement with Merrill Lynch nor did it perform any work for Merrill Lynch. *See id.*, Exh. C ¶ 20. However, Hillmann did conduct environmental monitoring during and after the cleanup and conducted an asbestos survey for Brookfield in the retail space. *See id.*, Exh. C ¶¶ 32, 43–46.

Merrill Lynch retained Pinnacle Environmental Corporation ("Pinnacle") and Blackmon–Mooring Steamatic Catastrophe, Inc. ("BMS") to conduct the cleanup work. *See* Goldstein Decl., Exh. P, Exh. R. The project began on September 24, 2001 and consisted of three phases: bulk cleanup, fine cleaning, and cleaning of the building's HVAC system. *See id.*, Exh. R. Pinnacle workers also conducted the mold abatement in the basement levels. *See* Kauffman Decl., Exh. O ¶ 8. Because initial environmental testing revealed asbestos levels above 1 %, Pinnacle implemented asbestos abatement procedures during the cleanup. *See* Goldstein Decl., Exh. P at 2. BMS initially performed work at 2 World Financial Center between October 18, 2001 and February 27, 2002. *See* Decl. Frank

Keenan Supp. BMS Mot. Summ. J. ("Keenan Decl."), Exhs. 12–13. BMS supervised Pinnacle workers for the fine cleaning phase. *See* Goldstein Decl., Exh. K, Exh. S at 35–36, Exh. FF at 27:12–16. Throughout the remediation, GPS and Weston provided continuous air monitoring and safety consulting. *See id.*, Exh. I, Exh. R, Exh. Y at 118:12–119:3, 194:11–23.

On October 19, 2001, Indoor Environmental Technologies, Inc. ("IET") conducted a single post-cleanup testing of the HVAC system for asbestos, lead, and microbial contamination. *See* Aff. John Stanley Supp. IET Mot. Summ. J. ("Stanley Aff.") ¶ 4. Beginning in February 2002, IET provided limited consulting services and project management for environmental testing of the HVAC system at 2 World Financial Center. *See id.*, Exh. B, Exh. D. IET presents evidence that it neither developed safety protocols for the abatement work performed by Pinnacle nor directly supervised Muszkatel's work. *See id.* ¶¶ 14–15.

Muszkatel, a member of Local 78 and licensed asbestos handler, was hired by Pinnacle to participate in the bulk and fine cleaning phases of the project. *See* Cannata Decl., Exh. 64 at 32:7–34:12, 125:18–126:13. He worked at 2 World Financial Center between November 14, 2001 and November 27, 2001. *See* Goldstein Decl., Exh. B. Both Pinnacle and BMS supervised Muszkatel's work. *See id.*, Exh. R, Exh. BB at 227:21–228:10. His work consisted of removing contaminated ceiling tiles, cleaning surfaces and ducts, and constructing a tunnel for debris removal. *See* Cannata Decl., Exh. 64 at 125:24–126:13, Exh. 66 at 302:18–303:24. Other workers removed metal studs and sheetrock, and cut open the HVAC ducts to clean inside. *See id.*, Exh. 53 at 239:2–23, Exh. 54 at 352:23–353:6. Muszkatel presents evidence that he and other workers were not provided with adequate respiratory equipment while performing the remediation. *See, e.g., id.*, Exh. 66 at 308:24–309:8, Exh. 76 at 467:14–468:18.

**B. 4 World Financial Center**

4 World Financial Center is located one block west of the World Trade Center site at 250 Vesey Street. On September 11, 2001, Brookfield owned WFP Tower D Co. L.P., which, in turn, owned the building and leased it to Merrill Lynch. *See* Kindbergh Aff. ¶ 4. BPCA was the ground lessor. *See* Goldstein Decl., Exh. DD at 16:13–18. 4 World Financial Center suffered no structural damage but dust and debris infiltrated the building. *See* Cannata Decl., Exh. 34 at 44. In mid-September, Merrill Lynch hired Weston to "provide oversight to all asbestos handlers in the building" and have air samples "analyzed for [asbestos containing material]" between September 15, 2001 and September 21, 2001. Goldstein Decl., Exh. F. Merrill Lynch retained Pinnacle to perform the remediation work during that same time period. *See id.*, Exh. J. On September 26, 2001, Weston confirmed that the abatement project was complete, *see id.*, Exh. F, and Merrill Lynch employees began reoccupying the building in October 2001.

Muszkatel fails to present any evidence that he worked at 4 World Financial Center. His Pinnacle work history states that he worked at "225 Liberty and 250 Ves[ey]" between November 14, 2001 and November 27, 2001. *See id.*, Exh. B. However, he fails to distinguish between the two. While he has put forth substantial evidence regarding his work at 2 World Financial Center, *see* Cannata Decl., Exh. 64 at 125:24–126:13, Exh. 66 at 302:18–303:2, with respect to 4 World Financial Center, he has pointed to no documentary evidence or deposition testimony that indi-

cates what type of work he performed, what type of protective equipment he wore, or whether he was even present at the building. While Muszkatel has also brought claims against BMS pursuant to his alleged work at 4 World Financial Center, there is uncontroverted evidence that BMS did not perform any work at that location. *See* Keenan Decl., Exh. 16 at 164:3–5, Exh. 17 at 61:3–9.

### C. 90 Church Street

90 Church Street is located one block north of the World Trade Center site. On September 11, 2001, the building was owned by the United States Postal Service, which had leased it to 90 Church Street L.P. *See* Decl. Richard Leff Supp. Boston Properties, Inc. Mot. Summ. J. ("Leff Decl."), Exh. G. Boston Properties, Inc. ("Boston Properties") managed the property. *See id.*, Exh. F at 11:2–11:13. The west side of 90 Church Street sustained severe structural damage—part of 7 World Trade Center had collapsed into its base and projectiles from the collapsing towers destroyed hundreds of windows. *See id.*, Exh. F at 58:3–58:22. Dust and debris were present throughout the building. *See* Cannata Decl., Exh. 47 at 155:14–156:6.

Boston Properties hired Ambient Group, Inc. ("Ambient") to evaluate the environmental condition of the building, develop a remediation protocol, and monitor the restoration process. *See* Leff Decl., Exh. H at 29:15–30:17. Boston Properties did not limit the scope of Ambient's work to asbestos abatement. *See* Cannata Decl., Exh. 175. Boston Properties retained Structure Tone, Inc. as general contractor for all repair and reconstruction of 90 Church Street. *See* Leff Decl., Exh. F at 104:11–105:16. Together, Structure Tone, Ambient, Boston Properties, and several non-party tenants developed a safety and remediation protocol that required testing of multiple contaminants including cement dust, PCBs, dioxins, asbestos, heavy metals, and pH levels. *See id.*, Exh. I at 30:4–34:21; Cannata Decl., Exh. 177 at 10–12. The protocol also required the use of licensed asbestos-abatement workers, compliance with asbestos regulations, and that workers be required to wear half-mask respirators. *See id.*, Exh. 177 at 6.

Structure Tone, as general contractor, oversaw the remediation process at 90 Church Street. It retained subcontractors and ensured compliance with safety protocols, including the use of proper respiratory equipment. *See* Aff. William Joyce Supp. Structure Tone, Inc. Mot. Summ. J. ("Joyce Aff."), Exh. G at 28:9–17, 46:19–47:12. While Structure Tone provided its own employees with "powered air purifying respirators," *see id.*, Exh. H at 21:15–22:7, it did not provide any equipment directly to the subcontractors' workers, *see id.*, Exh. G at 51:20–52:4, 90:9–13. Rather, subcontractors provided their employees with respiratory equipment and told them how often to change their filters. *See id.*, Exh. G at 51:20–52:4, 90:4–13, Exh. H at 72:14–73:2, Exh. I at 54:11–17. Additionally, Structure Tone's subcontractors would propose the manner and method of the work to Ambient, who would approve or disapprove the proposal. *See id.*, Exh. G at 151:24–152:8.

Muszkatel worked at 90 Church Street from approximately August 5, 2002 to September 30, 2002 for 336.5 hours. *See* Leff Decl., Exh. D. He worked for PAL Environmental ("PAL"), a subcontractor hired to perform the remediation. *See id.*, Exh. L at 128:17–129:3. His work consisted of cleaning and removing HVAC ducts, machinery, and electrical cables. *See id.*, Exh. L at 127:15–25; Cannata Decl., Exh. 65 at 69:6–70:3, 74:14–75:21. Other workers "demolished rooms," *see id.*, Exh. 55 at

495:22–496:3, and boarded up broken windows, see Joyce Aff., Exh. G at 36:2–12. Boston Properties alleges that, during this work, Muszkatel wore a half-face respirator with asbestos filters, Tyvek body suits and gloves provided by PAL. See Leff Decl., Exh. L at 149:16–150:15, Exh. N at 75:7–76:15. Muszkatel alleges that during the first two weeks, he did not wear any protective equipment whatsoever because he was "only removing the machinery" and not cleaning. See Cannata Decl., Exh. 65 at 74:6–13. Furthermore, he alleges that he was required to reuse clogged filters. See id., Exh. 64 at 148:19–149:15. He also alleges that he removed his respirator when disposing of ductwork and working in the basement because he "did not believe that there was any hazard in the air in that area" and he was not warned of a risk posed by asbestos or other contaminant. Leff Decl., Exh. L at 145:14–150:9.

### D. 140 West Street

140 West Street was owned by Verizon New York, Inc. ("Verizon") and was located directly north of the World Trade Center site and west of 7 World Trade Center. The building housed four of Verizon's network switches that provided telecommunications service to lower Manhattan. See Decl. Brett J. Broadwater Supp. Verizon Mot. Summ. J. ("Broadwater Decl."), Exh. C at 11:23–112:25, Exh. G at 37–39. The building sustained major damage on September 11, 2001. See Cannata Decl., Exh. 7 at 7–2. Steel beams from the collapse of 7 World Trade Center pierced the building's eastern façade leaving a four-story gash in the structure and a six-story high mound of debris leaning against the building. See Decl. Lee Ann Stevenson Supp. Verizon's Mot. Summ. J. Based on Immunity ("Stevenson Decl."), Exh. J at 7–12; Cannata Decl., Exh. 137. In addition, 140 West Street's two lowest basements flooded and the cable vault was punctured,

rendering Verizon's telecommunications equipment inoperable. See Broadwater Decl., Exh. C at 111:23–1 12:25. The building was widely contaminated with World Trade Center dust. See Cannata Decl., Exh. 17A¶4.

Verizon hired Hillmann to conduct initial bulk and air sampling as well as to act as project monitor for the debris and dust remediation project. Hillmann initially tested the dust and air for asbestos, and later a range of contaminants, including volatile organic compounds, PCBs, and heavy metals. See Broadwater Decl., Exh. I at 81:5–83:9, 89:21–93:19, Exh. V, Exh. W. Based upon Hillmann's assessment, and Verizon's consultation with various federal, state, and local agencies, Verizon treated the dust and debris removal as an asbestos abatement. See Stevenson Decl., Exh. A at 191:2–192:13; Broadwater Decl., Exh. P. Hillmann developed the specifications for the remediation project, see Broadwater Decl., Exh. P, Exh. I at 164:7–17, and made recommendations regarding the type of respiratory equipment to be worn, see Broadwater Decl., Exh. S. Verizon retained LVI Services, Inc. ("LVI")—an asbestos abatement contractor—to perform the removal and cleanup. See Stevenson Decl., Exh. A at 134:19–135:14. LVI, in turn, hired Muszkatel to assist with the cleanup. See Broadwater Decl., Exh. AE.

Verizon contends that supervisors from both LVI and Hillmann enforced the safety protocols and ensured that workers wore respiratory equipment required for asbestos abatement. See Stevenson Decl., Exh. V at 12:2–19, Exh. X at 417:23–419:2, Exh. Q at 164:7–17. However, Muszkatel has pointed to evidence that Verizon maintained an active supervisory presence at the worksite. For example, Verizon helped develop the asbestos abatement contractors' work plan, see Suppl. Decl.

Gregory J. Cannata Supp. Pls.' Opp'n Verizon Mot. Summ. J. Based on Immunity ("Cannata Suppl. Immunity Decl."), Exh. 1 at 151:3–13, and enforced the decontamination procedures, *see id.*, Exh. 1 at 162:4–22, Exh. 2 at 66:7–68:14. In addition, two Hillmann employees testified that Verizon decided what personal protective equipment the abatement workers would wear. *See* Cannata Decl., Exh. 115 at 75:15–76:3, Exh. 116 at 80:9–82:6. Verizon's Director of Safety, Health, and Environment testified that Verizon instructed the asbestos abatement contractors "what needed to be done and how it needed to be done." Cannata Suppl. Immunity Decl., Exh. 6 at 242:15–243:3.

Muszkatel worked at 140 West Street for 84 hours from September 14, 2001 to September 22, 2001. *See* Broadwater Decl., Exh. AD. His work consisted of clearing debris from stairwells, removing tiles, sheetrock, insulation and HVAC ducts, boarding up windows, and disassembling machinery. *See* Cannata Decl., Exh. 66 at 343:13–18. Muszkatel also built a tunnel used to remove debris, *see id.*, Exh. 64 at 121:23–122:5, and worked in basements and stairwells. *See id.*, Exh. 65 at 34:15–25, 38:23–39:15. Other workers demolished walls and removed window frames, *see id.*, Exh. 17A. Muskatel alleges that he was not required to wear a respirator, *see id.*, Exh. 64 at 162:12–17, Exh. 66 at 316:17–23, and that a decontamination unit was not initially available, requiring him to wash dust off himself using a fire hydrant in the street, *see id.*, Exh. 66 at 347:6–348:13. He further alleges that he was not informed that the World Trade Center dust was harmful. *See id.*, Exh. 64 at 100:21–101:11.

### E. 101 Barclay Street

101 Barclay Street is located one block north of the World Trade Center site and was owned by BNY Mellon on September 11, 2001. *See* Decl. Shabbir R. Chaudhury Supp. BNY Mellon Mot. Summ. J. ("Chaudhury Decl."), Exh. L at 13:17–22. The building sustained broken windows and an infiltration of World Trade Center dust and debris. *See* Cannata Decl., Exh. 19D. BNY Mellon retained LawGibb Group, LLC ("LawGibb") as its environmental consultant. *See id.*, Exh. L at 21:4–17. BNY Mellon did not limit the scope of the testing performed by LawGibb. *See id.*, Exh. L at 83:2–6. Due to the presence of asbestos in the dust, LawGibb recommended a remediation plan calling for the retention of an asbestos abatement contractor, which BNY Mellon accepted. *See id.*, L at 83:7–13; Cannata Decl., Exh. 100 at 2.

BNY Mellon hired Trade–Winds Environmental Restoration, Inc. ("Trade–Winds"), an asbestos abatement contractor, to perform the remediation. *See* Chaudhury Decl., Exh. L at 23:3–9. LawGibb issued "abatement procedures" to Trade–Winds that were "designed to remove asbestos contamination from the building." Cannata Decl., Exh. 100. Trade–Winds allegedly advised their employees that they may be working with toxic substances, and that they must wear Tyvek suits and respirators. *See* Chaudhury Decl., Exh. N at 95:17–24, 140:3–10, Exh. O at 112:3–7.

Muszkatel worked for Trade–Winds at 101 Barclay Street from approximately September 24, 2001 to October 22, 2001. *See id.*, Exh. C. His work consisted of cleaning, vacuuming carpet, removing debris and HVAC ducts, and boarding up windows. *See* Cannata Decl., Exh. 66 at 275–99. Muszkatel also worked in small, electrical closets in the basement. *See id.*, Exh. 66 at 272:15–22. Other workers removed ceiling tiles and sheetrock. *See id.*, Exh. 18B, Exh. 19D.

Muszkatel alleges that he received no instructions from Trade–Winds on how or when to use his respirator. *See id.,* Exh. 66 at 276:13–19. He was not told that the World Trade Center dust was hazardous. *See id.,* Exh. 66 at 281:3–14. Although he always wore a suit and gloves provided by Trade–Winds, he did not wear his respirator if the dust was not heavy. *See id.,* Exh. 66 at 270:23–271:4, 283:5–18. Further, a decontamination unit was not available at 101 Barclay Street. *See id.,* Exh. 65 at 90:5–24.

### F. 7 Dey Street

7 Dey Street is located one block east of the World Trade Center site and is owned by Sakele Bros. L.L.C. ("Sakele Bros."). *See* Decl. Suzanne Halbardier Supp. Sakele Bros. Mot. Summ. J. ("Halbardier Decl."), Exh. D at 10:9–11:5. The building did not sustain any structural damage although World Trade Center dust and debris entered the building. *See* Cannata Decl., Exh. 64 at 152:24–153:13, 155:12–22. The parties point to nothing in the record that indicates who Sakele Bros. hired to test the dust and debris and the scope of any such testing. However, testing was not conducted until November 2001. *See id.,* Exh. 168 at 57:8–58:16.

Muszkatel worked for Trade–Winds at 7 Dey Street for one day during the week of September 17, 2001. *See id.,* Exh. 64 at 152:24–153:13. However, Steven Sakele testified that he has no record of Trade–Winds performing work at 7 Dey Street. *See* Halbardier Decl., Exh. D at 85:3–25. Muszkatel's work consisted of loading dust and debris into trucks for removal. *See* Cannata Decl., Exh. 64 at 156:13–19. Other workers removed ceiling and floor tiles, and cleaned the HVAC system. *See id.,* Exh. 28 at 20. While performing his work, Muszkatel did not wear a half-mask respirator. *See id.,* Exh. 64 at 155:23–156:8.

Muszkatel further presents evidence that workers were not provided with any protective equipment at 7 Dey Street and that no decontamination unit was available. *See id.,* Exh. 28 at 24, Exh. 41 at 22, Exh. 68 at 108:15–109:8.

## II. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In ruling on a motion for summary judgment, the court must view all evidence in the light most favorable to the nonmoving party, *Overton v. N.Y. State Div. of Military & Naval Affairs,* 373 F.3d 83, 89 (2d Cir.2004), and must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford,* 391 F.3d at 83. However, in deciding a motion for summary judgment, a District Court is not required to "scour the record on its own in a search for evidence" where the non-moving party fails to adequately present it. *CILP Assocs., LP v. PriceWaterhouse Coopers LLP,* 735 F.3d 114, 125 (2d Cir.2013) (internal quotations and citations omitted).

## III. Discussion

### A. Exceptions to the Duty to Provide a Safe Workplace

 Various Defendants argue that Muszkatel's claims under the New York Labor Law are barred by two related ex-

ceptions to the duty to provide a reasonably safe workplace. The first exception applies to injuries sustained due to defective conditions that are "part of or inherent in" the very work being performed or conditions that are "readily observed by reasonable use of the senses in light of the worker's age, intelligence and experience." *Bombero v. NAB Constr. Corp.*, 10 A.D.3d 170, 171, 780 N.Y.S.2d 333 (1st Dep't 2004) (holding no duty owed to employee who walked directly on exposed steel bars that were part of the construction) (citing *Gasper v. Ford Motor Corp.*, 13 N.Y.2d 104, 242 N.Y.S.2d 205, 192 N.E.2d 163 (1963)). The second exception applies where the particular defect giving rise to a plaintiff's injury was the very defect the injured plaintiff was hired to remediate. *See Kowalsky v. Conreco Co.*, 264 N.Y. 125, 128, 190 N.E. 206 (1934) ("An employee cannot recover for injuries received while doing an act to eliminate the cause of the injury.").

█ Defendants have failed to point to any evidence that Muszkatel, in the terms of his hiring, was made aware that the dust he was hired to remove was "high-alkaline" dust, or that he was aware of the particular hazard it posed. Accordingly, for the reasons previously elaborated in *In re World Trade Center Lower Manhattan Disaster Site Litigation*, 44 F.Supp.3d 409, 426–27, No. 09–cv–680, 2014 WL 4446153, at *11–12 (S.D.N.Y. Sept. 9, 2014), I hold that neither exception applies to the work Muszkatel performed in the buildings at issue here.

## B. The Scope of the Duty Imposed by the New York Labor Law

█ The Environmental Consultant Defendants argue that they owed no duty under New York Labor Law because they were not owners, general contractors, or statutory "agents" under section 200 or section 241(6) of the New York Labor Law. In order for a party to have a duty under section 200, it must "have the authority to control the activity bringing about the injury to enable it to avoid or correct an unsafe condition." *Russin v. Louis N. Picciano & Son*, 54 N.Y.2d 311, 317, 445 N.Y.S.2d 127, 429 N.E.2d 805 (1981). Likewise, a party will be considered a statutory "agent" under section 241(6) if it has the authority to control the "injury producing activity." *Id.* at 317–18, 445 N.Y.S.2d 127, 429 N.E.2d 805. Muszkatel has presented evidence that each of the Environmental Contractor Defendants either developed the remediation protocols (including the required personal protective equipment to be worn by the workers) or influenced the decision to the treat the remediation as an asbestos abatement in the respective buildings for which they were retained. *See* Goldstein Decl., Exh. R, Exh. W at 103:18–105:18; Broadwater Decl., Exh. P, Exh. S; Calabrese Decl., Exh. C ¶¶ 32, 43–46; Leff Decl., Exh. H at 29:15–30:17. Accordingly, for the reasons previously elaborated in *In re World Trade Center Lower Manhattan Disaster Site Litigation*, 44 F.Supp.3d at 427–30, No. 09–cv–680, 2014 WL 4446153 at *12–14, I hold that Muszkatel has raised a triable issue of fact as to whether Hillmann, Ambient, and Weston had the authority to "avoid or correct" the alleged use of inadequate respiratory equipment, *Russin*, 54 N.Y.2d at 317, 445 N.Y.S.2d 127, 429 N.E.2d 805, and therefore owed a duty to Muszkatel under the Labor Law.[3]

---

**3.** Similarly, for the reasons previously elaborated in *In re World Trade Center Lower Manhattan Disaster Site Litigation*, 44 F.Supp.3d at 429–30, No. 09–cv–680, 2014 WL 4446153

at *14–15, I reject Hillmann's argument that it did not owe a duty of care to Muszkatel as a non-contracting third party. Muszkatel has raised an issue of fact that the Environmental

■ Similarly, Muszkatel has raised an issue of fact with respect to the role played by Structure Tone, at 90 Church Street, and BMS, at 2 World Financial Center, in the decision to either provide workers with allegedly inadequate equipment or asbestos-specific equipment allegedly inappropriate for the particular hazards encountered. *See, e.g.*, Leff Decl., Exh. I at 30:4–34:21; Cannata Decl., Exh. 66 at 307:21–309:8. Accordingly, there is an issue of fact as to whether Structure Tone or BMS had the authority to "avoid or correct" the use of inadequate respiratory equipment, *Russin*, 54 N.Y.2d at 317, 445 N.Y.S.2d 127, 429 N.E.2d 805, and therefore owed a duty to Muszkatel under the New York Labor Law.

With respect Muszkatel's claims arising from his work at 4 World Financial Center, Muszkatel has failed to present any evidence that he worked at that building. Furthermore, there is uncontroverted evidence that the abatement project had been completed by September 21, 2001 and that reoccupancy began in October 2001—over one month prior to the time Muszkatel alleged to have worked there. *See* Goldstein Decl., Exh. J. In addition, Muszkatel now concedes that BMS did not perform any work at that location. *See* Pl.'s Mem. Law Opp'n BMS Mot. Summ. J. at 1. Accordingly, I grant the motions for summary judgment filed by BMS, Merrill Lynch, and Weston with respect to Muszkatel's claims arising from his alleged work at 4 World Financial Center.

■ Similarly, Muszkatel has not raised a triable issue of fact with respect to IET's duty at 2 World Financial Center. IET has presented evidence that the scope of its work was limited to one-time inspections of the HVAC systems and post-clean-up air monitoring. *See* Stanley Aff. ¶¶ 4, 14–15. Further, IET has presented evidence that it neither developed safety and remediation protocols nor supervised Socha's work. *See id.* ¶¶ 11–15. Muszkatel has failed to point to any contradictory evidence. Accordingly, I hold that IET owed no duty to Muszkatel and grant its motion for summary judgment in its entirety.

## C. The New York Workers' Compensation Law

■ BMS also seeks dismissal of Muszkatel's claims against it based upon the New York Workers' Compensation Law. The New York Workers' Compensation Law bars an employee from suing his or her employer for work-related injuries. *See* N.Y. Workers Comp. Law § 11 (McKinney 2014); *Burlew v. Am. Mut. Ins. Co.*, 63 N.Y.2d 412, 416, 482 N.Y.S.2d 720, 472 N.E.2d 682 (1984). Furthermore, "a general employee of one employer may also be in the special employ of another, notwithstanding the general employer's responsibility for payment of wages and for maintaining workers' compensation and other employee benefits." *Thompson v. Grumman Aerospace Corp.*, 78 N.Y.2d 553, 555–57, 578 N.Y.S.2d 106, 585 N.E.2d 355 (1991) (holding employee to be "special employee" where general employer loaned employee to special employer who "exerted comprehensive control over every facet of his work" notwithstanding fact that general employer provided paychecks and Workers Compensation coverage). Designation as a special employer depends

---

Consultant Defendants exacerbated the existing hazard by influencing the choice of respiratory equipment incapable of handling that particular hazard and therefore breached an independent duty of care owed to Muszkatel by "launch[ing] a force or instrument of harm." *Espinal v. Melville Snow Contractors*, 98 N.Y.2d 136, 140, 746 N.Y.S.2d 120, 773 N.E.2d 485 (2002).

heavily on "who controls and directs the manner, details and ultimate result of the employee's work" and is usually a question of fact for the jury. *Id.* at 557–58, 578 N.Y.S.2d 106, 585 N.E.2d 355. "[A] finding of special employment is justified only where the special employer exerts complete and exclusive control over the purported special employee, as to whom the general employer has relinquished all control." *Sanfilippo v. City of New York*, 239 A.D.2d 296, 296, 657 N.Y.S.2d 423 (1st Dep't 1997) (citing *Thompson*, 78 N.Y.2d at 557, 578 N.Y.S.2d 106, 585 N.E.2d 355).

■■■ BMS argues that Muszkatel was its "special employee" at 2 World Financial Center and is, therefore, barred from suing it under the New York Workers' Compensation Law. It is undisputed that BMS supervised Pinnacle workers, including Muszkatel, at 2 World Financial Center. *See* Cannata Decl., Exh. 66 at 303:6–304:10, 306:20–307:24; Keenan Decl., Exh. 11 at 114:7–13. This supervision included providing instructions and holding daily safety meetings with the Pinnacle workers. *See id.*, Exh. 11 at 118:15–119:18. Testimony by Richard Doran, on behalf of Pinnacle, further confirms that Pinnacle provided the labor while BMS supervised the workers. *See id.*, Exh. 18 at 47:8–48:7. However, Muszkatel points to evidence that Pinnacle maintained an active supervisory presence at the worksite. For example, John Elliot, a BMS project manager, testified that Pinnacle maintained its own supervisors onsite who worked alongside BMS supervisors *See* Decl. Gregory J. Cannata Supp. Pl.'s Opp'n BMS Mot. Summ. J., Exh. 2 at 114:7–24. Furthermore, Doran testified that Pinnacle provided the personal protective equipment worn by the workers at 2 World Financial Cen-

ter. *See id.*, Exh. 3 at 49:2–19. This is sufficient to raise an issue of fact as to whether BMS exercised "complete and exclusive" supervision over Muszkatel's work. *Sanfilippo*, 239 A.D.2d at 296, 657 N.Y.S.2d 423. Accordingly, I deny BMS's motion for summary judgment as to Muszkatel's claims arising from his work at 2 World Financial Center.

### D. New York Labor Law Section 200

Section 200 of the New York Labor Law codifies[4] the common law duty "to protect the health and safety of employees." *In re Joint E. & S. Dist. Asbestos Litig.*, 827 F.Supp. 1014, 1052–53 (S.D.N.Y.1993), *aff'd in part rev'd in part on other grounds*, 52 F.3d 1124 (2d Cir. 1995). Specifically, section 200 requires that a workplace "be so constructed, equipped, arranged, operated and conducted as to provide a reasonable and adequate protection to the lives, health and safety of all persons employed therein or lawfully frequenting such places." N.Y. Labor Law § 200(1) (McKinney 2014).

■■■ Section 200 has two disjunctive standards for determining liability. *See Chowdhury v. Rodriguez*, 57 A.D.3d 121, 128, 867 N.Y.S.2d 123 (2d Dep't 2008). When a plaintiff's injury "arises out of defects or dangers in the methods or materials of the work," the "means and methods" standard will apply. *Id.* By contrast, where a plaintiff's injuries arise out of the "condition of the premises rather than the methods or manner of the work," the "premises liability" standard applies. *Id.* If an injury arises from both sets of conditions, concurrently, the proofs are to be evaluated under both standards. *See Reyes v. Arco Wentworth Mgmt. Corp.*, 83

---

4. Because section 200 is a codification of common law negligence, courts analyze the claims simultaneously. *See Wojcik v. 42nd St.*

*Dev. Project*, 386 F.Supp.2d 442, 455 n. 15 (S.D.N.Y.2005) (collecting cases).

A.D.3d 47, 52, 919 N.Y.S.2d 44 (2d Dep't 2011) ("When an accident is alleged to involve defects in both the premises and the equipment used at the work site, the property owner moving for summary judgment with respect to causes of action alleging a violation of Labor Law § 200 is obligated to address the proof applicable to both liability standards.").

Muszkatel alleges that his injuries arose from two concurrent causes: (1) the toxic "alkaline-based" dust and debris that spewed out of the collapsed World Trade Center buildings on September 11, 2001 and present in each of the relevant buildings, and (2) the use of respiratory equipment and safety procedures inappropriate for the particular hazard posed by the "alkaline-based" dust. Accordingly, I have to evaluate the proofs relevant to both the "means and method" standard and the "premises liability" standard. *See id.*

1. **The "Means and Methods" Standard**

■ Where a plaintiff's claim arises out of an alleged defect or condition in the "methods or materials" of the work, a party subject to Labor Law § 200 cannot be held liable unless "it is shown that the party to be charged exercised some supervisory control over the operation." *Ross v. Curtis–Palmer Hydro–Elec. Co.,* 81 N.Y.2d 494, 505, 601 N.Y.S.2d 49, 618 N.E.2d 82 (1993); *see also Persichilli v. Triborough Bridge & Tunnel Auth.,* 16 N.Y.2d 136, 262 N.Y.S.2d 476, 209 N.E.2d 802 (1965).

With the exception of Verizon, the Owner Defendants adequately show that they did not exercise supervisory control over the work giving rise to Muszkatel's injuries. Muszkatel's opposition papers fail to rebut the Owner Defendants' showing. Accordingly, I hold that no genuine issue of material fact under the Section 200

"means and methods" standard exists. Owners Defendants' motions for summary judgment are granted to the extent they seek dismissal of Muszkatel's claims under the Section 200 "means and methods" standard.

■ However, Muszkatel has presented evidence, sufficient to raise a triable issue of fact, that Verizon exercised supervisory control over his work at 140 West Street. For example, two Hillmann employees testified that Verizon employees were present at the worksite and decided what personal protective equipment workers were required to wear. *See* Cannata Decl., Exh. 115 at 75:15–76:3, Exh. 116 at 80:9–82:6. Accordingly, I deny Verizon's motion for summary judgment to the extent it seeks dismissal of Muszkatel's claims under the Section 200 "means and methods" standard.

Similarly, I deny the Environmental Consultant Defendants' motions for summary judgment. Muszkatel points to evidence that, at each of the relevant buildings, the Environmental Consultant Defendants played a role in the choice of respiratory equipment and safety procedures employed by the contractors that hired Muszkatel to perform the clean-up work. *See* Goldstein Decl., Exh. W at 103:18–105:18; Calabrese Decl., Exh. C ¶¶ 32, 43–46; Cannata Decl., Exh. 117, Exh. 118, Exh. 152 at 16:18–24; Leff Decl., Exh. H at 29:15–30:17, Exh. I at 30:4–34:21; Stevenson Decl., Exh. A at 191:2–192:13. This is sufficient to raise a triable issue of fact as to whether the Environmental Consultant Defendants "exercised supervisory control over the means and method of the work." *Ross,* 81 N.Y.2d at 505, 601 N.Y.S.2d 49, 618 N.E.2d 82.

For the same reasons, I deny Structure Tone's motion for summary judgment.

Structure Tone helped develop the remediation protocol for the work performed at 90 Church Street. *See* Leff Decl., Exh. I at 30:4–34:21. This is sufficient to raise a question of fact as to Structure Tone's liability under section 200 of the Labor Law.

Finally, I deny BMS's motion for summary judgment. It is undisputed that BMS exercised direct supervisory control over Muszkatel's work at 2 World Financial Center. *See* Cannata Decl., Exh. 66 at 303:6–304:10, 306:20–307:24; Keenan Decl., Exh. 11 at 114:7–13. Furthermore, Muszkatel presents evidence that the safety equipment and procedures implemented were inadequate to protect the workers from the "high-alkaline" World Trade Center dust. *See, e.g.,* Cannata Decl., Exh. 66 at 308:24–309:8, Exh. 76 at 467:14–468:18. Accordingly, he has raised a triable issue of fact as to BMS's liability under section 200 of the Labor Law.

### 2. The "Premises Liability" Standard

Where a plaintiff's claim arises out of the condition of the premises, a party is liable if (1) it created the dangerous condition causing the injury or (2) failed to remedy a dangerous or defective condition of which he or she had actual or constructive notice. *See Ortega v. Puccia,* 57 A.D.3d 54, 61, 866 N.Y.S.2d 323 (2d Dep't 2008). Muszkatel presents evidence that the Owner Defendants either retained environmental consultants and contractors specifically to perform asbestos abatement and monitoring or played some role in the decision to implement asbestos abatement procedures at the worksites. *See, e.g.,* Kauffman Decl., Exh. O ¶ 6; Cannata Decl., Exh. 117, Exh. 118, Exh. 154 at 2; Leff Decl., Exh. I at 30:4–34:21; Stevenson Decl., Exh. A at 191:2–192:13; Broadwater Decl., Exh. P. It is true that certain Owner Defendants did not initially limit the scope of the consultants' work to asbestos testing and monitoring. *See, e.g.,* Cannata Decl., Exh. 175; Chaudhury Exh. L at 83:2–6. In addition, there is evidence that some Owner Defendants relied on the opinions of their retained environmental consultants. *See, e.g.,* Cannata Decl., Exh. 100. However, on the record before me, I cannot hold as a matter of law that the Owner Defendants played no role in the allegedly unreasonable decision to use asbestos-specific safety equipment and procedures. Accordingly, for the reasons previously elaborated in *In re World Trade Center Lower Manhattan Disaster Site Litigation,* 44 F.Supp.3d at 433–35, No. 09–cv–680, 2014 WL 4446153 at *18–19, I deny the Owner Defendants' motions for summary judgment under section 200 of the Labor Law.

### E. New York Labor Law Section 241(6)

Section 241(6) of the New York Labor Law provides that:

> All areas in which construction, excavation or demolition work is being performed shall be so constructed, shored, equipped, guarded, arranged, operated and conducted as to provide reasonable and adequate protection and safety to the persons employed therein or lawfully frequenting such places. The commissioner may make rules to carry into effect the provisions of this subdivision, and the owners and contractors and their agents for such work ... shall comply therewith.

N.Y. Labor Law § 241(6) (McKinney 2014). The statute imposes a non-delegable duty upon owners, general contractors, and their agents, to ensure worksite compliance with the New York Industrial Code. *See Morris v. Pavarini Constr.,* 22 N.Y.3d 668, 673, 985 N.Y.S.2d 202 (2014);

*Rizzuto v. L.A. Wenger Constr. Co.*, 91 N.Y.2d 343, 348, 670 N.Y.S.2d 816, 693 N.E.2d 1068 (1998). To prove vicarious liability under section 241(6), a plaintiff must demonstrate that (1) the work giving rise to the injury was in connection with "construction, excavation or demolition"; and (2) a violation of an applicable regulation implementing section 241(6) caused the plaintiff's injury. *See Nagel v. D & R Realty Corp.*, 99 N.Y.2d 98, 101, 752 N.Y.S.2d 581, 782 N.E.2d 558 (2002); *Rizzuto*, 91 N.Y.2d at 348–50, 670 N.Y.S.2d 816, 693 N.E.2d 1068. These requirements are addressed in turn.

### 1. "Construction, Excavation or Demolition"

For the reasons stated in *In re World Trade Center Lower Manhattan Disaster Site Litigation*, 44 F.Supp.3d at 435–40, No. 09–cv–680, 2014 WL 4446153 at *20–23, I hold that Muszkatel's work at 101 Barclay Street and 7 Dey Street was not sufficiently related to "construction, excavation or demolition" to support a claim under section 241(6) of the New York Labor Law. None of these buildings sustained structural damage and the primary damage was limited to an infiltration of World Trade Center dust. *See* Cannata Decl., Exh. 19D, Exh. 64 at 152:24–153:13. The work performed to remediate these buildings consisted exclusively of cleaning the dust and removing contaminated debris, tiles and sheetrock. *See id.*, Exh. 18B, Exh. 19D, Exh. 28 at 20, Exh. 64 at 156:13–19. Accordingly, I grant the Defendants' motions for summary judgment and dismiss Muszkatel's section 241(6) claims arising from his work at 101 Barclay Street and 7 Dey Street.

However, Muszkatel has raised a question of fact as to whether his work performed at 2 World Financial Center, 90 Church Street, and 140 West Street was sufficiently connected to "construction, ex-cavation or demolition" to support his section 241(6) claims. 2 World Financial Center suffered hundreds of broken windows, demolished walls, and the destruction of the "Winter Garden." *See id.*, Exh. 139. Similarly, 7 World Trade Center collapsed into the base of 90 Church Street, causing significant structural damage. *See* Leff Decl., Exh. F at 58:3–58:22. Similarly, steel beams from the collapse of 7 World Trade Center caused significant structural damage to 140 West Street. *See* Cannata Decl., Exh. 7 at 7–12, Exh. 137. At these locations, the remediation effort included substantial renovations, including the removal of wall studs, the demolition of walls, and the construction of tunnels for the removal of debris. *See, e.g., id.*, Exh. 53 at 239:2–23, Exh. 54 at 352:23–353:6, Exh. 55 at 495:22–496:3, Exh. 64 at 120:23–121:16. Accordingly, with respect to these three buildings, I must address the second prong of section 241(6) liability.

### 2. Violation of Applicable Industrial Code Provision

Liability under section 241(6) also requires a violation of Part 23 of the New York Industrial Code, the regulations implementing section 241(6). *See Kaczmarek v. Bethlehem Steel Corp.*, 884 F.Supp. 768, 779 (W.D.N.Y.1995); *Nostrom v. A.W. Chesterton Co.*, 59 A.D.3d 159, 872 N.Y.S.2d 122 (1st Dep't 2009). It is insufficient to allege violations of OSHA regulations, *see Rizzuto*, 91 N.Y.2d at 351 n. 1, 670 N.Y.S.2d 816, 693 N.E.2d 1068, or Part 12 of the New York Industrial Code, *see Kagan v. BFP One Liberty Plaza*, 62 A.D.3d 531, 532, 879 N.Y.S.2d 119 (1st Dep't 2009). Further, the provision of Part 23 alleged to have been violated must "mandate compliance with concrete specifications and not simply declare a general safety standard or reiterate common-law principles." *Misicki v. Caradonna*, 12

N.Y.3d 511, 515, 882 N.Y.S.2d 375, 909 N.E.2d 1213 (2009); *see also Ross,* 81 N.Y.2d at 505, 601 N.Y.S.2d 49, 618 N.E.2d 82 (1993). The provision must add a "specific, positive command" beyond the duty of reasonableness imposed by the common law. *Ross,* 81 N.Y.2d at 504, 601 N.Y.S.2d 49, 618 N.E.2d 82.

For the reasons previously elaborated in *In re World Trade Center Lower Manhattan Disaster Site Litigation,* 44 F.Supp.3d at 442–44, No. 09–cv–680, 2014 WL 4446153 at *26–27, I grant the Defendants' motions with respect to Muszkatel's claims under section 241(6) of the Labor Law alleging violations of sections 23–1.7(g) and 23–2.1(b) of the Industrial Code. Muszkatel alleges that he worked in basements and staircases at 140 West Street. *See* Cannata Decl., Exh. 65 at 34:15–25, 38:23–39:15. However, he fails to point to any facts that suggest he worked in "enclosed" areas, which had "restricted means of egress," as required to be considered a "confined, unventilated area" as that term has been interpreted by New York courts. N.Y. Comp.Codes R. & Regs. tit. 12, §§ 12–1.3(f), 23–1.7(g) (2014); *Cerverizzo v. City of New York,* 116 A.D.3d 469, 470–71, 983 N.Y.S.2d 515 (1st Dep't 2014); *Kagan,* 62 A.D.3d at 532, 879 N.Y.S.2d 119.

■ I deny the Defendants' motions with respect to Muszkatel's claims alleging violations of sections 23–1.5(c)(3), 23–1.7(h), 1.8(c)(4), and 23–1.8(b)(1) of the Industrial Code. Those provisions impose sufficiently "specific, positive commands" to serve as predicate violations under section 241(6), *Ross,* 81 N.Y.2d at 504, 601 N.Y.S.2d 49, 618 N.E.2d 82, and Muszkatel has presented evidence, sufficient to raise a triable issue of fact, that his injuries were caused by their violation.

## IV. Conclusion

In summary, and for the foregoing reasons, the motion filed by BMS is GRANTED with respect to Muszkatel's section 200 and section 241(6) claims arising from his work at 4 World Financial Center. The motion is DENIED with respect to his section 200 claims arising from his work at 2 World Financial Center. The motion is GRANTED with respect to his section 241(6) claims, arising from his work at 2 World Financial Center, alleging violations of Industrial Code Rules 23–2.1(b) and 23–1.7(g), and DENIED with respect to his section 241(6) claims alleging violations of Industrial Code Rules 23–1.5(c)(3), 23–1.7(h), 23–1.8(c)(4), and 23–1.8(b)(1).

The motion filed by Hillmann is DENIED with respect to Muszkatel's section 200 claims arising from his work at 2 World Financial Center and 140 West Street. The motion is GRANTED with respect to his section 241(6) claims, arising from his work at 2 World Financial Center and 140 West Street, alleging violations of Industrial Code Rules 23–2.1(b) and 23–1.7(g), and DENIED with respect to his section 241(6) claims alleging violations of Industrial Code Rules 23–1.5(c)(3), 23–1.7(h), 23–1.8(c)(4), and 23–1.8(b)(1).

The motion filed by Boston Properties and 90 Church Street L.P. is DENIED with respect to Muszkatel's section 200 claims arising from his work at 90 Church Street. The motion is GRANTED with respect to his section 241(6) claims, arising from his work at 90 Church Street, alleging violations of Industrial Code Rules 23–2.1(b) and 23–1.7(g), and DENIED with respect to his section 241(6) claims alleging violations of Industrial Code Rules 23–1.5(c)(3), 23–1.7(h), 23–1.8(c)(4), and 23–1.8(b)(1).

The motion filed by Verizon is DENIED with respect to Muszkatel's section 200 claims arising from his work at 140 West

Street. The motion is GRANTED with respect to his section 241(6) claims, arising from his work at 140 West Street, alleging violations of Industrial Code Rules 23–2.1(b) and 23–1.7(g), and DENIED with respect to his section 241(6) claims alleging violations of Industrial Code Rules 23–1.5(c)(3), 23–1.7(h), 23–1.8(c)(4), and 23–1.8(b)(1).

The motion filed by Structure Tone is DENIED with respect to Muszkatel's section 200 claims arising from his work at 90 Church Street. The motion is GRANTED with respect to his section 241(6) claims, arising from his work at 90 Church Street, alleging violations of Industrial Code Rules 23–2.1(b) and 23–1.7(g), and DENIED with respect to his section 241(6) claims alleging violations of Industrial Code Rules 23–1.5(c)(3), 23–1.7(h), 23–1.8(c)(4), and 23–1.8(b)(1).

The motion filed by Weston is GRANTED with respect to Muszkatel's section 200 and section 241(6) claims arising from his work at 4 World Financial Center. The motion is DENIED with respect to Muszkatel's section 200 claims arising from his work at 2 World Financial Center. The motion is GRANTED with respect to his section 241(6) claims, arising from his work at 2 World Financial Center, alleging violations of Industrial Code Rules 23–2.1(b) and 23–1.7(g), and DENIED with respect to his section 241(6) claims alleging violations of Industrial Code Rules 23–1.5(c)(3), 23–1.7(h), 23–1.8(c)(4), and 23–1.8(b)(1).

The motion filed Merrill Lynch is GRANTED with respect to Muszkatel's section 200 and section 241(6) claims arising from his work at 4 World Financial Center. The motion is DENIED with respect to Muszkatel's section 200 claims arising from his work at 2 World Financial Center. The motion is GRANTED with respect to his section 241(6) claims, arising from his work at 2 World Financial Center, alleging violations of Industrial Code Rules 23–2.1(b) and 23–1.7(g), and DENIED with respect to his section 241(6) claims alleging violations of Industrial Code Rules 23–1.5(c)(3), 23–1.7(h), 23–1.8(c)(4), and 23–1.8(b)(1).

The motion filed by Ambient is DENIED with respect to Muszkatel's section 200 claims arising from his work at 90 Church Street. The motion is GRANTED with respect to his section 241(6) claims, arising from his work at 90 Church Street, alleging violations of Industrial Code Rules 23–2.1(b) and 23–1.7(g), and DENIED with respect to his section 241(6) claims alleging violations of Industrial Code Rules 23–1.5(c)(3), 23–1.7(h), 23–1.8(c)(4), and 23–1.8(b)(1).

The motion filed by BNY Mellon is DENIED with respect to Muszkatel's section 200 claims and GRANTED with respect to Muszkatel's section 241(6) claims, arising from his work at 101 Barclay Street.

The motion filed by Sakele Bros. is DENIED with respect to Muszkatel's section 200 claims and GRANTED with respect to Muszkatel's section 241(6) claims, arising from his work at 7 Dey Street.

The motion filed by IET is GRANTED in its entirety with respect to Muszkatel's section 200 and section 241(6) claims arising from his work at 2 World Financial Center, and Muszkatel's claims against IET are dismissed.

The Clerk shall mark the following motions in No. 06–cv–05285 as terminated: Doc. No. 152, Doc. No. 155, Doc. No. 161, Doc. No. 166, Doc. No. 170, Doc. No. 174, Doc. No. 184, Doc. No. 190, Doc. No. 194, Doc. No. 198, and Doc. No. 204. The Clerk shall enter judgment in case number 06–cv–5285 dismissing the Complaint against IET, with costs to IET. Muszkatel shall file an Amended Complaint by Octo-

ber 29, 2014, consistent with this Order and Opinion, dropping IET from the caption and the allegations and retaining the paragraph numbering of the existing complaint. Defendants' Answers need not be amended.

SO ORDERED.

